[Civ. No. 4091.  Third Appellate District.—May 16, 1930.]

SAM BALLSUN et al., Respondents, v. STAR PETROLEUM COMPANY (a Corporation), Appellant.

Neil S. McCarthy, George J. Stoneman and Earl L. Banta for Appellant.

Carl B. Sturzenacker for Respondents.

PLUMMER, J.—The plaintiffs had judgment against the defendant for the sum of $1210 for and on account of damages alleged to have been suffered by reason of the failure of the defendant to replace certain buildings upon a tract of land theretofore leased by the plaintiffs to the defendant for the purpose of exploring the same for oil. From this judgment the defendant appeals.

The record shows that on or about the twenty-second day of June, 1925, the plaintiffs and the defendant entered into a certain indenture of lease for the purpose of having wells sunk on the lands described, to determine their oil-producing qualities. The salient portions of the lease involved in this action are as follows:

"Witnesseth:

"That for and in consideration of Ten Dollars ($10.00) by the lessee in hand paid to the Lessor, receipt of which is hereby acknowledged, and in consideration of the performance by the lessee of the covenants and agreements hereinafter contained, the lessor has leased, let and demised, and by these presents does lease, let and demise unto the lessee, the lands hereinafter described, with the sole and exclusive right to the lessee to drill for, produce, extract and take oil, gas, asphaltum, and other hydro-carbon substances, and water from, and store the same upon said land during the term hereinafter specified, with the right to enter upon said land at all times for said purposes, and from time to time to construct, use, maintain, erect, repair, replace, and remove thereon and therefrom, all buildings, tanks, machinery, telephone and telegraph wires, and other structures, including all pipe-lines which the lessee may desire in carrying on its business and mining operations on said premises, with the rights of way for passage over, upon and across, and ingress and egress to and from said premises. The possession of the lessee of said land held by it under this lease shall be sole and exclusive, excepting only that

the lessor reserve the right to occupy and use said land or to lease the same, or any part thereof, for agricultural or grazing purposes, which shall be carried on subject to and with no interference with the rights or operations of the lessee hereunder. The said land which is the subject of this lease is situated in the County of Los Angeles, State of California, and is described as follows, to-wit: The south half of Lot twenty-three (23) of the Gardena Heights Tract, as per map recorded in Book 11, page 164 of Maps, in the office of the County Recorder of said County. The lessee shall hold said land with the appurtenances, for the period of twenty (20) years from the date hereof, and so long thereafter, not exceeding fifty (50) years in the aggregate, as oil, gas, asphaltum or other hydro-carbon substances are produced thereon and therefrom in quantities deemed paying quantities by the lessee, and the lessee hereby leases from the lessor the above described lands for the purposes and term aforesaid, and upon the conditions and considerations hereinafter set forth:

"1.

"The lessee, in consideration of the premises, does hereby covenant and agree as follows:

"a- That it will commence the drilling of a well for oil on said leased premises, within one month from the date hereof, and thereafter prosecute said work with reasonable diligence, continuously and in good faith, until oil and/or gas is produced in quantities deemed paying quantities by the lessee, or until said well is drilled to a depth of 5000 feet. It is hereby agreed that the term 'commence drilling of a well for oil' means the actual spudding in of the well.

"b- That upon the cancellation of this lease, either in whole or in part, or the termination thereof under the terms hereof, either by expiration, surrender or forfeiture, it will well, truly and peaceably surrender up the possession of all those portions of said leased premises as to which this lease may be cancelled, surrendered or terminated, and execute and deliver to the lessor a good and sufficient quit-claim deed, acknowledging and evidencing such termination and cancellation according to the fact. The lessee shall restore the premises as to which this lease is terminated and cancelled to as near their original conditions as is reasonably possible so to do."

682

Following the execution of this lease the defendant entered upon the leased lands and proceeded to sink a well thereon to the required depth. No oil having been discovered, work upon the leased lands was discontinued.

This action is based upon the following words appearing in the lease from which we have quoted to wit: "The lessee shall restore the premises as to which this lease is terminated and cancelled, to as near their original condition as is reasonably possible so to do."

The record shows that there were two garages, a cow barn and a hay barn upon the leased lands; that the garages were moved and a portion of the cow barn was taken down, and the material removed to a different place on the leased land. In addition to this, there were some shrubbery, trees and a blackberry patch. The record is somewhat indefinite as to just what small buildings and portions of the barn were removed, but from what is hereinafter said, this does not appear to be material.

Prior to the execution of the lease the transcript shows that certain negotiations were had between the plaintiffs, acting through their duly authorized agent, and the defendant, relative to the amount of a bonus to be paid for the privilege of carrying on oil exploration work on the tract of land owned by the plaintiffs. The tract of land, comprising some two and one-half acres, had theretofore been used by the plaintiffs in conducting a dairy business. The testimony shows without conflict that the dairying business could not be carried on without change of location, in the event that the tract of land was leased for oil development purposes. The record shows that after the negotiations had been carried on between the respective parties, the defendant prior to the execution of the lease paid to the plaintiffs the sum of $10,000, the purposes of this payment being disputed. On the part of the defendant testimony was introduced that it covered the expenses of moving the buildings referred to from the place where explorations were to be carried on, and on the part of the plaintiffs, that it was simply so much paid for the privilege to be granted the plaintiffs in the way of a lease for oil development purposes of the two and one-half acres. Several witnesses testified on behalf of the defendant, to the effect that in the first conversation with Mr. Ballsun relative to the bonus

to be paid, the sum of $7,500 was mentioned and was tentatively agreed upon, but that the next time the matter was taken up being the following day—Ballsun had raised the sum demanded, $2,500 and stated that his reason for so doing was that some of the buildings would have to be removed, and that he would have to have that sum, in addition, to cover the damages.

While the trial court's findings do not follow its expressed views, we quote here its language because it expresses our opinion as to just what the testimony does show, without setting it forth at length. The trial court, in discussing this testimony, said: "The more reasonable construction, in the mind of the court, is that Mr. Ballsun expected to reengage in the dairy business in some different location; because that was undoubtedly figured in connection with his damages in contemplation of the payment of this bonus. I have no doubt that the testimony of the witness that he raised the 'ante' from $7,500 to $10,000 was true, and that he did that for the reasons that he then gave. Upon further figuring he concluded that it would be necessary to remove or destroy these buildings, and he would suffer an additional damage by reason of that fact." The court then, in relation to the lease, explained why the facts were not found strictly in accordance with what the overwhelming weight of testimony shows in this particular. The court further said: "If the court concludes that it is bound by the plain language used (referring to the lease), and that the defendants were required, upon the surrender of these premises, . . . that it is necessary to allow damages in accordance with the strict provisions of the lease, it is rather a difficult thing for the court to know just what to allow." The findings of the court relative to this phase of the case are as follows: "Finding No. 5. That on or about the 22d day of June, 1925, pursuant to said lease, the defendant entered into possession of the property, through its agents and servants and employees, and some of the buildings (were) removed from the premises. Finding No. 6. That certain portions of the premises were graded and leveled by the defendant, but the said land was leveled in a rough and hilly condition, containing certain depressions and piles of dirt upon the said premises. That at the time of the execution of the lease, the plaintiffs well knew that an oil

well was to be drilled upon said premises, and that the sum of $10,000 was paid to the plaintiffs as a bonus for the use of said premises, but that said $10,000 was paid for the use of said land for the purpose of exploring for oil and was not accepted as full or any compensation for all or any damage that might have been suffered to the plaintiffs, and that the defendant did replace some dirt, but that the work was inspected by the plaintiffs and was rejected by the plaintiffs.'' The court then found, in finding No. 7, that $1210 is a reasonable sum to cover the costs of replacing said improvements on said property. Thus, inferentially, and not directly, does the court find that the bonus did not cover the cost of removing buildings, or damage incurred by the removal of buildings, if any, and only inferentially, and not directly does the court find that the original figure of $7,500 offered as a bonus was not raised $2,500 to cover the item of costs or damage in the removal of buildings necessary to enable an oil-well to be drilled upon the land.

The oral negotiations relative to the bonus to be paid, and the purposes for which it was to be paid all took place prior to the execution of the lease, and it would appear from the transcript that the sum of $10,000 was paid prior to the execution of the lease, and the findings of the court in relation thereto should have been according to the expressed views of the court, of what facts the testimony established, without any reference whatever to the terms of the lease. The lease itself makes no mention of any bonus, and so far as the lease is concerned, the negotiations with reference to the bonus would have no bearing unless the testimony in relation thereto might be considered in determining the interpretation to be given to the word ''premises,'' which it is necessary to consider to ascertain what the parties had in view as to what should be done in the event of the termination of the lease.

The theory upon which the cause was determined by the court was that irrespective of the purposes for which the bonus was paid, the terms of the lease required the lessee to replace the buildings upon the leased lands by reason of this clause which we have heretofore quoted, to wit: ''The lessee shall restore the premises, as to which this lease is terminated and canceled, to as near their original condition as is reasonably possible so to do.'' In construing

the intent and purpose of this provision we think the trial court was in error. The provisions of the lease which we have set out gave to the lessee the right to remove all buildings which it might ''desire in carrying on its business and mining operations on said premises.'' Here is a definite statement of what the parties intended by the use of the word ''premises.'' The defendant was given the privilege of removing buildings from the premises, which means from the lands on which the mining operations were to be performed. The following clause in the lease goes directly to the subject ''land,'' giving the lessee the right to use the same, save and except that the lessor retains the right to occupy and use said land, or any part thereof, for agricultural or grazing purposes, which shall be carried on without interference with the operations of the lessee. Following this we find these words: ''The said land, which is the subject of this lease, is situated in the County of Los Angeles, State of California, and described as follows, to wit'': (Here follows the description of the land.) This land is then leased to the defendant for the period of twenty years, with a possible extension of fifty years, for a specific purpose, to wit, exploration for oil products, etc. It is then provided that a well shall be sunk to the depth of 5,000 feet. After the setting forth of these terms of the lease, it is then provided that in the event of the cancellation or surrender, the premises shall be restored to their original condition as nearly as possible. That the parties did not have in mind that the use of the word ''premises,'' in the restoration clause, referred to anything but the land, is very well shown by the reasoning of the trial court, to wit: ''The lease is for the term of twenty years, and in the minds of all the parties, undoubtedly there was the picture of a producing oil-well, or producing oil-wells, lasting over the period of this twenty years. They all undoubtedly thought that this was oil-producing property; and, had their expectations been realized, there never would have been any lawsuit here. So I say that the court must keep in mind, in placing a construction upon this language, if it is required to do that, the fact that, at the time, the parties had no thought, apparently, but what this lease would run for the period of twenty years. So that it is rather far-fetched to say that they at that time figured that,

at the expiration of the twenty-year period, that property should be restored to its original condition for dairy purposes.''

Though the trial court finally considered itself bound to give a different interpretation of the word ''premises,'' we think that just what has been here stated is the only reasonable interpretation to be placed upon the word ''premises,'' as used in the lease which we are here considering. The trial court was undoubtedly led into error in its interpretation of the meaning of the word ''premises,'' as used in this lease, from the frequent use of that word where buildings only, or buildings, also, are included. The authorities are numerous to the effect that in insurance cases the word ''premises'' means ''buildings,'' or in leases of buildings it sometimes means the part of a building which is leased.

In the case under consideration land is made the subject of the lease. The lessee is given the privilege of disturbing and digging up the land, changing its surface, as it necessarily would do in digging a well to the depth of 5,000 feet. Much soil would be taken from beneath the surface, and this necessarily would have to be leveled and placed in such a position as not to interfere with the further use of the leased land. Derricks, oil-tanks, pipe-lines, etc., would necessarily have to be taken away.

The word ''premises'' has different meanings, as was said in *Old South Assn.* v. *Codman,* 211 Mass. 211 [97 N. E. 766, 767], where the Supreme Court of Massachusetts was considering the use of the word. We find the following in the opinion in that case: '' 'Premises' is a word which may have different meanings, depending upon its connection, and the object with which it is applied. It oftentimes describes the fee of land. But it may signify something less extensive if the context seems to require it. In order to determine the sense in which it was used in this indenture, it is important to bear in mind the subject about which the parties were contracting, and their general purpose.'' This is particularly applicable to the instant case. The parties were contracting about explorations upon the land. They had in view digging wells upon the land. They did not have in view restorations of buildings twenty years later, or, under the terms of the lease, possibly seventy years later, as an

option was given for a fifty-year extension. In Webster's Dictionary (Edition of 1928), we find the following definition of "premises": "The property conveyed in a deed; hence, in general, a piece of land or real estate; sometimes in fire insurance papers, a building or buildings on land as to leased premises; the premises insured." That the word "premises" has various meanings, and must be considered in relation to that which precedes, or to which it refers, is shown by the definition of the word "premises" found in 49 C. J., page 1328, to wit: "In popular usage the term has come to mean lands and dominions; land or lands; lands or the buildings thereon; land and its appurtenances; the grounds immediately surrounding a house; a piece of real estate. Such use seems now to have the support of widespread and frequent usage. It is also often construed to mean, buildings; a building with its adjuncts; and even, rooms and apartments within a building, or the floor of a building. It will be seen that the word signifies a distinct and definite locality. Otherwise, its use will be misapplied." The notes found in connection with the text which we have just quoted show that the word is used as meaning lands and houses, and as meaning lands only, and as meaning houses as distinct from land; also, as parts of a building. Under the liquor laws of the United States, "premises" usually includes the buildings. (*McSherry* v. *Heimer et al.*, 132 Minn. 260 [156 N. W. 130].) In this case, while it is particularly held to mean "buildings," it was held, also, that it included the lands and structures thereon, so that a search-warrant included the buildings and its surroundings. In the case of *M. M. Rowe Co.* v. *Wallerstein*, 145 Va. 191 [133 S. E. 669], the court was considering a lease using simply the word "premises," and it was there said that a "lease of realty, using word 'premises,' without qualifying words, means land and buildings thereon." In the case there considered, however, the premises were described as the first and second floors only of a certain building, and the holding of the court was that the premises referred only to the building and not to the lands surrounding the building.

A summary of these authorities shows that the interpretation to be given to the word "premises" depends entirely upon its use in the instrument where it appears, and the

subject matter to which it refers. The lease under consideration specifically states that the subject of the lease is land, the language being: "The said land which is the subject of this lease," etc.; two and one-half acres in extent. There is another reference to mining operations on said premises which cannot be construed to mean anything other than mining operations upon the leased land, and then, when it comes to restoring to original condition, the use of the word "premises" alone can only be logically construed to relate to that which previously appears in the lease fixing the subject matter to which it refers, to wit, the land which is leased, and the premises or lands upon which the mining operations are conducted.

While the court's findings, contrary to its expressed views, would be binding upon us where the evidence is conflicting, even though it largely preponderates against the finding of the court, yet the construction of the court given to the lease is not binding, and whether we consider the purposes for which the bonus was given, or consider the lease alone, the conclusion seems unescapable, from what we have stated, that the parties had in contemplation only the restoration of the land to its normal condition, and that the word "premises" as it appears in the restoration clause cannot be wrested from the subject matter of the lease and the former interpretation given by the parties in the use of the word "premises" in referring to operations thereon, and given a distinct and contrary meaning which would be evidently directly opposed to the intention of the parties when executing the lease.

█ Appellant further contends that unless the interpretation which we have heretofore given is correct, an ambiguity exists in relation to use the word "premises," and, therefore, subdivision 12 of section 1870 of the Code of Civil Procedure applies, and that testimony as to usage and custom in relation to the business being conducted, and the interpretation given to such leases in the vicinity where oil development work is carried on, is admissible. Acting in accordance with this view the appellant placed upon the witness-stand witnesses who testified as to the usage and interpretation given to the word under consideration, and what was done in the way of restoring the land to its normal condition, which testimony was stricken out by the

court, and then the further question was asked of one of the witnesses, as follows: "Q. Do you know whether or not there is a custom in the vicinity of the Rosecrans' Field governing the construction of this phrase to which I have called your attention?" (The lease referred to lands in the Rosecrans' Field.) The court sustained an objection to this testimony, and in so ruling stated in substance that no testimony along the line pertaining to usage or custom would be admitted. No further attempt was made to introduce testimony as to custom or usage, but the ruling of the court is now urged as error. Under the cases of *Pastene* v. *Pardini*, 135 Cal. 431 [67 Pac. 681], and *Mahoney et al.* v. *Atchison, T. & S. F. Ry. Co.*, 101 Cal. App. 652 [281 Pac. 1108], it was proper for the appellant to bow to the ruling of the court and not seek to offer any further testimony bearing upon the subject of usage or custom. Appellant's contention appears to be well founded.

There being no findings of the court as to what damages, if any, have been suffered by the plaintiffs by reason of the alleged failure of the defendant to restore the surface of the land to its original condition as nearly as possible, the cause must go back for retrial to determine the extent of such damages, if any.

The judgment is reversed.

Thompson (R. L.), J., and Finch, P. J., concurred.