25 Cal.2d 1 (1944)
Estate of CHARLES HENRY STONE RULE, Deceased. ALEX McCLUSKEY, Respondent,
v.
WALLACE L. WARE et al., as Executors, etc., Appellants.
Sac. No. 5607. 
Supreme Court of California. In Bank. 
Oct. 16, 1944.
 Young, Hudson & Rabinowitz for Appellants.
 Barrett & McConnell and A. Dal Thomson for Respondent.
 Breed, Burpee & Robinson as Amici Curiae on behalf of Respondent.
 SCHAUER, J.
 This is an appeal by the executors of the last will and testament of Charles H. S. Rule, deceased, from an order of the probate court fixing and allowing a broker's commission, and directing payment thereof by the executors, to respondent real estate broker Alex McCluskey, upon the sales to a purchaser secured by respondent of certain real and personal property of the Rule estate. The substance of appellants' contention is that the evidence fails to support the interpretation which the trial court (sitting in probate) placed upon a written contract between appellants and respondent relative to the procurement of a purchaser, and that therefore such court erred in allowing respondent a commission *5 on the sales. We have concluded that the evidence is not as a matter of law insufficient to support any essential implied finding and that the order appealed from must be affirmed.
 The respondent Alex McCluskey, doing business under the firm name and style of McCluskey Realty Company, Santa Rosa, California, at all times concerned was a duly licensed real estate broker and his son C. E. McCluskey was a licensed salesman employed by the father. They carried on their business correspondence on stationery with letterheads showing their profession. As early as January 16, 1942, respondent or his son and agent, on their letterhead stationery, wrote to H. S. Young, an attorney whose firm was employed as the attorneys for the executors in this estate and who was handling the estate matters on behalf of his firm, stating that "Mr. Tom Brownscombe, Attorney here in Santa Rosa, gave us your name stating that you were the attorney for the Charles Rule estate. We have two or three substantial cash buyers for stock ranches and would like to know at an early date if the Rule Ranch at Jenner is for sale and your best price. The writer has been on the ranch several times and we feel that we are fairly familiar with same." On January 20 Mr. Young replied as follows: "In response to your letter of January 16th, I beg to enclose herewith prospectus on the Rule Ranch. Any cattleman who buys this ranch would take over the registrations for the Hereford breeding stock and the well known good will." The prospectus, which, in effect, is an obvious sales talk and invitation for bids on the property, accompanied the letter.
 In August, 1942, in continuation of the negotiations which had been opened in January, the agent on behalf of the realty company, on its letterhead, wrote to Young for, and the latter in response mailed to him, an inventory of the livestock and equipment on the Rule Ranch. In the meantime the agent had contacted one Louis T. Willig, had succeeded in interesting him in purchasing the property and, during the latter part of August, was, with the father, respondent herein, engaged in assisting Willig to obtain financing for the purchase. On August 24 Willig, who had just learned that one of the executors was one W. P. Wobber, a personal acquaintance of his, inquired of the agent whether the latter would object if he, Willig, saw Wobber personally concerning the property, and received the agent's permission to do so. There was no suggestion *6 that either Willig or the agent intended that by permitting the personal contact the latter should be understood to waive his obvious expectancy of earning and receiving a commission on any sale which might ensue to his client. The agent and Willig thereafter made arrangements to meet at the former's office (that of the McCluskey Realty Company) in Santa Rosa on September 2, 1942, and then to proceed to a nearby bank to discuss financing of the proposed purchase. Willig failed to appear at the real estate office the morning of the date set, and in the afternoon the agent inquired of the bank whether Willig had been there. He was informed that Willig had come to the bank that morning (September 2), that they had "gotten together" on the financing, and that Willig had stated he was not going to file a bid through the realty company--through whose efforts, as related, his interest in the ranch had been aroused and who had carried on the preliminary negotiations which led to the financing arrangements. The agent forthwith telephoned Young, attorney for the executors, and informed him "that Mr. Willig had not kept an appointment with us that day and that I telephoned Mr. Fuller [the banker] and had asked him if Mr. Willig had been there and he stated that he had. And I further asked him [Fuller] if they had gotten together on any financing and he told me they had. And I then--and also that I had been advised by Mr. Fuller that Mr. Willig had stated he wasn't going to file a bid through us... So I told Mr. Young that we very definitely wanted to register Mr. Willig's name with him and Mr. Young told me to write him, accordingly, so he should be sure he would have it the following morning, which morning, I believe, was the date the bids were to be opened, so I did so, and sent it special delivery." (Italics added.) The letter written by the agent to Young was dated September 2, 1942, and reads as follows: "On January 20th you wrote us, enclosing a prospectus of the Rule Ranch, offering it for sale. With this authority, we contacted Mr. L. J. Willig, 38--8th St., San Francisco, and have for some little time discussed the ranch with him. When Mr. Thomas Brownscombe of Santa Rosa [who apparently was acting as an agent or representative for the executors] advised us that bids under the probate sale were being solicited we immediately sought to interest Willig in filing a bid. It seems that following our conversation in this regard he contacted Mr. Wobber and was advised that ... no real estate brokers *7 had been invited to solicit bids upon the property. [If this statement was made by Wobber the trial court could have found that it was untrue, as is shown by the correspondence above quoted in which Mr. Young, as agent for the executors, impliedly invited the claimant here to solicit a bidder for the property.]"
 "Upon Tues., Aug. 25, we again contacted Mr. Willig, by appointment, and discussed the possibilities of financing the purchase and the amount of his proposed bid. In the meantime we had ascertained from one of our local banks what they would loan him on the property. Yesterday, Sept. 1, we 'phoned Mr. Willig, making an appointment to meet him at our office following an interview he proposed to have with Mr. Fuller, Pres. of the Bank of Sonoma County at Sebastopol. Mr. Willig failed to appear at our office and upon our 'phoning Mr. Fuller we were advised that Mr. Willig had told him of our contact with him but that ... he was going to file directly with Mr. Wobber."
 "We feel very definitely that under the circumstances if Mr. Willig does file a bid it should be regarded as being subject to our commission." (Italics added.)
 Under date of September 5, 1942, Young replied as follows: "I have your letter of September 2nd. The executors have not yet made any return on the Rule Ranch sale, so as I write this letter it is questionable as to who will be the successful bidder. While it is most agreeable to us to deal with brokers nevertheless this bid came directly from the purchaser and not through any broker, as a net bid. I think you will fully understand as the attorney for the estate there is nothing I can do concerning your commission." (Italics added.) The statement in the above quoted letter that "this bid came directly from the purchaser and not through any broker" is apparently true only in a limited and technical sense. The evidence amply supports a finding that the bid came through the efforts of the broker who contacted and interested the bidder and carried on negotiations with him as shown above. The statement that the proposal came "as a net bid" is, of course, a conclusion of the writer of the letter, not binding on Mr. McCluskey or the court.
 On September 12, 1942, the executors, knowing that the broker had actually procured the bid and that he would claim a commission on the sale if confirmed, through Young's law *8 firm filed in the probate court two returns of sale--one of the ranch and the other of certain stock and other personal property thereon. The returns recited that Willig had become the prospective purchaser of the real property for $75,000 and of the personal property for $20,000, and prayed that the sales to him be confirmed. Court hearings thereon were set for September 25.
 On September 22 the above mentioned Mr. Thomas M. Brownscombe, an attorney and inheritance tax appraiser in Santa Rosa, at whose office the executors in this estate had specified that bids for the ranch property should be filed, wrote to Young in San Francisco as follows: "Dear Harry: Mr. Alex McCluskey, a broker of this city, has one or more prospective purchasers for the Rule ranch and personal property. I have advised him that for his protection he should have a formal listing from the executor before making a bid in court. Accordingly I enclose herewith a form of contract to be signed by the executor. If it meets with your approval would you kindly have it signed and return it to me."
 The form of contract referred to in this letter was, under date of September 23, 1942, signed by the two executors, and, prior to the hearings on September 25 of the petitions for confirmation of the proposed sales, was delivered to the respondent. It is addressed to the respondent, dated September 23, 1942, and the body of it reads as follows:
 "This will authorize you to procure a purchaser for the real and personal property of the estate of CHARLES H. S. RULE, deceased, a petition for the confirmation of the sale of which has been heretofore filed in the Superior Court of Sonoma County. A commission will be paid you out of the proceeds of a sale to any purchaser secured by you in an amount to be fixed and allowed by the court upon confirmation of the sale." It is signed, "Very truly yours, Wallace L. Ware Executor. W. P. Wobber Executor."
 Obviously the executors in signing the quoted contract did not regard the property as having been actually sold. No other bids were made at the time of the court hearings on September 25, and on that date Mr. Willig's bids were considered by the court and the sales to him confirmed. By stipulation of the parties the hearing on respondent's application for broker's commissions was continued to October 2. Subsequent continuances placed the actual hearing on such *9 application on November 27, 1942. In the meantime the executors filed a third return of sale, reciting that certain additional personal property on the ranch had been sold by them to Willig for $2,300 and praying confirmation of the sale. Hearing on such return was also set for November 27, and on that date the sale to Willig was confirmed. On December 22, 1942, the court, having received evidence, including the correspondence above quoted and the testimony of Mr. C. E. McCluskey and Mr. H. S. Young, without written findings made its order that a broker's commission of $4,865 (five per cent of the total sales price of $97,300) be allowed to respondent and that the executors forthwith pay to respondent such commission out of the proceeds of the sales then in the hands of the executors.
 Appellants contend:
 First, that the contract embodied in the letter of September 23, 1942, addressed to respondent broker and signed by the two appellant executors evidences no intention by the executors to pay to respondent a commission for services which the latter had already performed, viz., the procuring of Willig as a bidder and prospective purchaser for the estate property; and that such contract should be construed as referring to future or other bidders to be produced by respondent.
 Second, that, in any event, the authority granted appellants by section 760 of the Probate Code to contract to pay a commission to a real estate agent out of the proceeds of the sale of estate property to any purchaser secured by such agent is by the terms of that section limited to services to be performed and purchasers to be secured by the agent in the future, and that appellants were without power to contract to pay for services already rendered by an agent.
 [1] Section 760 of the Probate Code, upon which each of the parties hereto relies, provides as follows: "The executor or administrator may enter into a written contract with any bona fide agent to secure a purchaser for any real or personal property of the estate, which contract shall provide for the payment to such agent out of the proceeds of a sale to any purchaser secured by him of a commission the amount of which must be fixed and allowed by the court upon confirmation of the sale; and when said sale is confirmed to such purchaser, such contract shall be binding and valid as against the *10 estate for the amount so allowed by the court. By the execution of any such contract no personal liability shall attach to the executor or administrator, and no liability of any kind shall be incurred by the estate unless an actual sale is made and confirmed by the court." (Italics added.) The above italicized language providing against liability "unless an actual sale is made and confirmed by the court" clearly indicates that in the contemplation of the statute the sale is not regarded as "made" unless and until it is confirmed by the court. Hence, strictly speaking, the purchaser cannot be regarded as "secured" until the sale has been confirmed, nor, by the other italicized language of the section, is the contract valid or binding for any purpose unless and until the sale is confirmed.
 [2a] Appellants, in support of their first contention--that the contract by its own words clearly contemplates payment to respondent for futures services only--urge the right of the trial court in construing the contract to consider the "surrounding circumstances and the matter to which" the contract relates, and particularly the expressions contained in the letter of September 22 to Young from Brownscombe (whom appellants designate as respondent's attorney and agent) with which the contract form was forwarded to Young for signing by appellant executors. The fact is, however, that the trial court had before it and undoubtedly did consider evidence of the surrounding circumstances, including the Brownscombe letter, and yet determined that respondent broker was entitled to his earned commission. [3] And, in the absence of findings of fact and conclusions of law, every intendment is in favor of the judgment or order appealed from and it is presumed that every fact or inference essential to the support of the order and warranted by the evidence was found by the court. (See Haime v. de Beaulieu (1942), 20 Cal.2d 849, 852 [129 P.2d 345]; Bekins Van Lines, Inc. v. Johnson (1942), 21 Cal.2d 135, 137 [130 P.2d 421]; Estate of Shaw (1927), 85 Cal.App. 518, 525 [260 P. 351]; 2 Cal.Jur. 852, 499; 10 Cal.Jur. 741; 62.) [2b] Whether, in the light of the conflicting inferences to be drawn from the evidence, the parties by their contract intended to provide for the payment to respondent of a commission for his past services--which had not yet matured into a confirmed sale and which, hence, in one sense, were services in course of rendition--in securing Willig as a bidder and prospective purchaser, *11 or contemplated payment for future services only, was for the determination of the trial court and its decision may not be interfered with by us on appeal. [4] The rule is that an "appellate court will accept or adhere to the interpretation [of a contract] adopted by the trial court--and not substitute another of its own-- ... where parol evidence was introduced in aid of its interpretation, and such evidence ... is such that conflicting inferences may be drawn therefrom." (4 Cal.Jur. 10-Yr. Supp. (1943 rev.) 146-147, 192; see also 2 Cal.Jur. 934-939, 549.) Certainly inferences may be drawn from the contract and the surrounding circumstances here which would support the finding which we must presume was made by the trial court relative to the intention of the contracting parties.
 [5] From the date of the first communication (January, 1942) between respondent or his agent on the one hand and Young, as attorney for the executors, on the other, it was known to Young and through him to the executors (1 Cal.Jur. 846-847, 125; 3 Cal.Jur. 611, 25; Laukkare v. Abramson (1935), 9 Cal.App.2d 447, 449 [50 P.2d 478]; Smith v. Thomsen (1935), 8 Cal.App.2d 603, 606 [48 P.2d 102]) that respondent's realty company was interested in securing a purchaser for the estate property and in thereby earning a commission. [6] The evidence shows that Mr. Young, and, consequently, the executors, knew at the time Willig's bid was received that he had been secured by respondent as a prospective purchaser and they (Young and the executors) had been specifically notified, prior to the time that they determined to accept Willig's bid and prior to their filing in court of the petitions to confirm the sales to him, of that fact and of the fact that respondent claimed to be entitled to a commission for his services performed. Thereafter appellant executors filed the petitions for confirmation and, prior to the hearing on such petitions, executed the contract under which the trial court presumably awarded a commission to respondent. It has been consistently held in this state, following the language of Muir v. Kane (1909), 55 Wash. 131, 135-136 [104 P. 153, 19 Ann.Cas. 1180, 26 L.R.A.N.S. 519] that "The moral obligation to pay for services rendered as a broker in selling real estate under an oral contract, where the statute requires such contract to be in writing, is just as binding as is the moral obligation to pay a debt that has become barred by the *12 statute of limitations; and there is no reason for holding that the latter will support a new promise to pay while the former will not. There is no moral delinquency that attaches to an oral contract to sell real property as a broker. This service cannot be recovered for because the statute says the promise must be in writing, not because it is illegal in itself. It was not intended by the statute to impute moral turpitude to such contracts. The statute was intended to prevent frauds and perjuries, and, to accomplish that purpose, it is required that the evidence of the contract be in writing; but it is not conducive to either fraud or perjury to say that the services rendered under the void contract or voluntary will support a subsequent written promise to pay for such services." (Italics added.) See Coulter v. Howard (1927), 203 Cal. 17, 22- 23 [262 P. 751]; In re Balfour & Garrette (1910), 14 Cal.App. 261, 265-266 [111 P. 615]; Carrington v. Smithers (1915), 26 Cal.App. 460, 463-464 [147 P. 225]; Kinney v. Jos. Herspring & Co. (1921), 53 Cal.App. 628, 638 [200 P. 737]; Pryor v. McGuire (1922), 59 Cal.App. 234, 239-240 [210 P. 532]; Johnson v. Krier (1922), 59 Cal.App. 330, 332 [210 P. 966]. Consequently the contract executed after the services of respondent were performed insofar as procuring the making of the bid was concerned, but before such bid had ripened into a confirmed sale, was legally sufficient to satisfy the requirement, if any, of a written authorization.
 [7] Moreover, the acts of the executors in accepting the benefits of respondent's services by petitioning for confirmation of the sale to Willig (until which confirmation, as previously noted, there could be no binding obligation to pay a commission), after definite notice that respondent was the procuring cause of Willig's bid, and in thereafter executing the written contract of September 23, constituted ratification of the acts of respondent as agent of the executors in the same manner (i. e., in writing) as it is claimed was required for a precedent authorization, and thus entitled respondent broker to his commission. (See 4 Cal.Jur. 578-579, 22.)
 [8] Appellants charge that certain expressions contained in the letter of September 22 from Brownscombe to Young (which accompanied the form of written contract executed September 23) indicate that the contract contemplated payment to respondent for future services only, that in writing such letter and preparing the contract Brownscombe was acting *13 as attorney and agent for respondent, that therefore respondent is bound by the letter, and that, moreover, the contract should be most strongly construed against respondent, whose attorney, claim appellants, prepared it. The record, however, is devoid of evidence (unless it is to be inferred from the letter itself) that Brownscombe at any time acted as either attorney or agent for respondent. On the contrary, it was in Brownscombe's office that the executors had by published notice specified that bids for the estate property were to be filed and the Return of Sale of Real Estate and Petition for Confirmation alleges that the sale was made "at the place specified in said notice, to wit: care of Mr. Thomas M. Brownscombe, Exchange Bank Building, Santa Rosa, California." It was logical and reasonable for the trial court to conclude, in the light of all the circumstances, that Brownscombe was an agent of appellants rather than that he represented respondent. Therefore, the language of Brownscombe's letter must be construed against appellants and in favor of respondent. Likewise the contract which was executed by appellants certainly is not necessarily shown to have been formulated by respondent or by anyone acting as his agent or representative. It was forwarded to Mr. Young by Mr. Brownscombe and, the trial court presumably found, was prepared by Mr. Brownscombe in a spirit of fairness to Mr. McCluskey, although acting as the agent of the executors. Fair dealing in private transactions is to be presumed. (Code Civ. Proc., 1963(19).) Such contract, therefore, also is to be construed against the appellants rather than against respondent.
 [9] It may also be noted that although appellants argue that the contract was prospective only and was intended by the parties thereto to cover only future services to be redered by respondent, i.e., the production of increased bids in court at the time of hearing on the petitions for confirmation of the sales to Willig, no express contract is required by the Probate Code in order to entitle to a commission a broker producing a purchaser to whom, upon an increased bid in open court, the sale is confirmed. Under such circumstances, by the provisions of section 761 of the Probate Code, such broker is entitled to commission on the full purchase price for which the sale is confirmed, less one-half of the commission on the original bid. The authorization to pay this commission *14 is fixed by law and the amount must be fixed by the court. Neither the obligation nor the amount is dependent on any express or written contract. The commission is simply allowed as a judicial act, an incident of an order of the court confirming the sale. The statute of frauds has no application, as the right to the commission is not based on a contract, at least not on any express contract. (Prob. Code, 761; see, also, Halleck v. Guy (1858), 9 Cal. 181, 195 [70 Am.Dec. 643].) Both Brownscombe and Young were attorneys practicing their profession in this state, and it may have seemed more probable to the trial judge that they would participate in advising and securing for Mr. McCluskey a contract seemingly necessary for a commission under section 760 rather than one apparently unnecessary for a commission under section 761.
 [10] The language of Brownscombe's letter, previously mentioned, supports the implied views of the trial court. In the letter Mr. Brownscombe says, "I have advised him [Mr. McCluskey] that for his protection he should have a formal listing from the executor before making a bid in court. Accordingly I enclose herewith a form of contract to be signed by the executor. If it meets with your approval would you kindly have it signed and return it to me." (Italics added.) While conflicting inferences may be drawn it is apparent that the trial court could have considered as significant the fact that Mr. McCluskey would need no protection in the shape of a written contract for a commission on a sale which might be confirmed to a new bidder in open court on proceedings initiated to confirm a sale to a previous bidder. No "approval" by Mr. Young or the executors would be necessary to entitle him to the commission on such a proceeding. Likewise the statement in the Brownscombe letter that Mr. McCluskey had "one or more prospective purchasers for the Rule ranch and personal property" was a proper and correct reference to Mr. Willig and, the trial court was warranted in finding, Mr. Young and the executors knew it. Willig, obviously, was a "prospective purchaser" until the proposed sales to him had been confirmed. The statement in the letter that in Mr. Brownscombe's opinion Mr. McCluskey should have "a formal listing ... before making a bid in court" may be presumed to have been interpreted by the trial court as referring to the actual presentation in court of Mr. Willig's bids in asking *15 confirmation thereon. The fact that Mr. Young had previously written respondent that "this bid came directly from the purchaser and not through any broker ... I think you will fully understand as the attorney for the estate there is nothing I can do concerning your commission," did not preclude him from subsequently recognizing the technicality of his own position and the apparent fairness and justice of respondent's claim or from changing his mind and advising his clients to execute the contract.
 [11] Appellants seek to sustain their second contention--that, as executors, they were without authority to contract to pay a commission to respondent for the procuring of a purchaser whose bid had already been returned to the court for confirmation--by reliance upon the doctrine, enunciated in Perry v. Superior Court (1938), 29 Cal.App.2d 114, 116 [84 P.2d 250], that "the administration of the estate of deceased persons is purely statutory, and the procedure outlined in the statutes is controlling. When the powers and duties of the administrator are fixed by statute there is no inherent right to assume or exercise any power not conferred, or to depart from the procedure outlined." (See, also, 11a Cal.Jur. 86-87, 35.) They assert that the opening words of section 760 of the Probate Code, i. e., "The executors ... may enter into a written contract with any bona fide agent to secure a purchaser for any real or personal property of the estate," limit the power of an executor to that of contracting to pay for services to be performed by the agent in the future and that he is not empowered to agree to pay for past services--in this case the procuring of a bid which appellant executors had accepted but which the court had not yet confirmed. Respondent, however, urges that a purchaser has not been "secured" within the meaning of section 760 until a sale has been completed by court confirmation and fixing of the amount of commission to be allowed, and that until that time the executors may execute the contract authorized by the section and may thereby bind the estate to the payment of the commission fixed by the court upon confirmation. Actually, the estate is not bound by any such contract until and unless the proposed sale is confirmed by the court and then the commission is payable only out of the proceeds of the sale. The section in question itself provides that "when *16 said sale is confirmed to such purchaser, such contract shall be binding and valid as against the estate." (Italics added.) It apparently is contemplated that the contract shall not create any obligation until the sale is so confirmed. Hence execution of the contract at any time prior to actual confirmation of the sale would appear to answer the requirements of the law. [12] Furthermore, it is to be noted that the section directs that the contract "shall provide for the payment to such agent out of the proceeds of a sale to any purchaser secured by him of a commission ..." (Italics added.) This language is broad enough to include any prospective purchaser previously solicited to whom a sale is eventually confirmed. A bidder is not actually a purchaser within the meaning of the statute until the sale to him has been confirmed.
 In Wilson v. Fleming (1930), 106 Cal.App. 542, 549 [289 P. 658], the court in construing the first two paragraphs of section 1559 of the Code of Civil Procedure (the same, except for immaterial changes, as present Probate Code section 760), held that "not until ... a deed is passed and a mortgage or deed of trust taken for such payments as are deferred, has a sale been actually completed within the meaning of section 1559 [of the Code of Civil Procedure]." And as defined by Webster's New International Dictionary (1943 ed.), "to secure" is "to acquire certainly." In 56 Corpus Juris 1275-1276 the verb "secure" is stated to mean "to acquire certainly, ... to confirm."
 [13] Moreover, provisions of the Probate Code are to be liberally construed with a view to effect its objects and to promote justice. (Estate of Paterson (1939), 34 Cal.App.2d 305, 315-316 [93 P.2d 825].) It appears that such a construction was adopted by this court in the recent case of Estate of Mitchell (1942), 20 Cal.2d 48 [123 P.2d 503], in which a broker was awarded a commission on a sale of estate property to a purchaser secured by him under a contract (in the form of a letter) which failed to make express provision for payment of any commission whatever, either out of proceeds of the sale or from any other source. In affirming the award this court, speaking through Mr. Justice Shenk, stated (pp. 50-51), "Although the parties did not expressly provide for a commission it is not seriously questioned that a commission was intended if a sale was consummated and confirmed by *17 the court. The exchange of letters clearly indicated that a commission was contemplated. A statement therein of the amount of the commission would be nugatory, for the reason that the statute requires the court to fix the commission upon the confirmation of the sale. ... Furthermore the words, '[the contract] shall provide for the payment to such agent out of the proceeds of a sale to any purchaser secured by him of a commission ...' as used in this section [Prob. Code, 760] are not necessarily mandatory. ... [P. 52] We conclude that the statute effects the inclusion of the limitation in the contract and that failure to include it in the writing does not render the contract void." [14] In the instant case the trial court must be presumed to have found that the parties by their contract of September 23 intended that in case the sale to Willig was confirmed respondent was to be paid a commission out of its proceeds. The evidence and the law support the conclusion that in so executing such contract the executors acted fairly and did not transcend their authority. [15] In testing the validity of the contract and the obligation of the estate in this proceeding it is also presumed that they are acting fairly and by way of discharge of what they conceive to be their fiduciary obligations as executors.
 For the reasons above stated the order appealed from is affirmed.
 Gibson, C.J., Shenk, J., Curtis, J., and Carter, J., concurred.
 TRAYNOR, J.
 I dissent. The majority opinion holds that this court is bound by the implied interpretation of the agreement of September 23, 1942, by the trial court because "[conflicting] inferences may be drawn from the contract and the surrounding circumstances." The very possibility of what the majority opinion calls conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility. It is established that in the absence of conflicting extrinsic evidence the appellate court must make its own interpretation of the instrument, displacing the interpretation of the trial court if they are inconsistent. (Estate of Platt, 21 Cal.2d 343, 352 [131 P.2d 825]; Moffatt v. Tight, 44 Cal.App.2d 643, 648 [112 *18 P.2d 910]; Mitchel v. Brown, 43 Cal.App.2d 217, 222 [110 P.2d 456]; Texas Co. v. Todd, 19 Cal.App.2d 174 [64 P.2d 1180]; Wall v. Equitable Life Assur. Soc., 33 Cal.App.2d 112 [91 P.2d 145]; see O'Connor v. West Sacramento Co., 189 Cal. 7, 18 [207 P. 527]; California W. D. Co. v. California M. O. Co., 178 Cal. 337, 341 [177 P. 849]; Brant v. California Dairies, Inc., 4 Cal.2d 128, 133 [48 P.2d 13]; 5 C.J.S. 32, 722, 751.) If the extrinsic evidence is conflicting, the trial court, having seen and heard the witnesses, is in a better position to evaluate that evidence, and its interpretation of the instrument is ordinarily conclusive. (See 111 A.L.R. 742.) Even then, however, the appellate court will determine the reasonableness of the trial court's interpretation based on its findings as to extrinsic facts. (Melvin v. Berendsen, 7 Cal.App.2d 389, 391 [46 P.2d 189]; Ballsun v. Star Petroleum Co., 105 Cal.App. 679, 685 [288 P. 437]; Fowle v. Bigelow, 10 Mass. 379.)
 In interpreting a written agreement, the court must ascertain the meaning of the words and other manifestations of intention forming the agreement. (Restatement: Contracts: 226; 3 Williston, On Contracts [1936] p. 1726.) It must consider the usual meaning of the words, the circumstances in which they were used, and the reasons for their use. This function is a judicial one, even though it "may not involve any question of law in the exact sense" (Thayer, Preliminary Treatise on Evidence, p. 204) to be exercised according to the generally accepted canons of interpretation so that the main purpose of the instrument may be given effect. (See Civ. Code, 1635-1661; Code Civ. Proc., 1856- 1866.) Factual and legal elements are so closely interwoven that there can be no effective review of the trial court's interpretation unless the appellate court goes through the whole process of interpretation. Otherwise conflicting decisions of trial courts, in the event one party has made identical agreements with other parties, would have to be affirmed by the appellate courts, which would be bound by any number of conflicting interpretations of the same agreement.
 In the present case there was no conflict in the extrinsic evidence. This court is therefore bound to make its own interpretation of the agreement of September 23, 1942. That agreement was the only one existing between the parties, for the correspondence between respondent and the attorney for *19 the estate before September 23, 1942, consisting of requests for information by the respondent and answers by the executors, did not constitute a contract authorizing or employing respondent to procure a purchaser. (Morrill v. Barneson, 30 Cal.App.2d 598 [86 P.2d 924]; Lambert v. Gerner, 142 Cal. 399 [76 P. 53]; Kleinsorge & Heilbron v. Liness, 17 Cal.App. 534, 536 [120 P. 444]; see 4 Cal.Jur. 554.) The agreement of September 23, 1942, read in the light of the previous rejection of respondent's claim for a commission on the sales to Willig and the Brownscombe letter with which the form of contract signed by them was sent to the executors, is open to only one reasonable interpretation, namely, that it authorized respondent to procure a new purchaser and promised a commission payable out of the proceeds of any sale to such purchaser. The text of the agreement, authorizing respondent to procure a purchaser and promising a commission in the event of a sale to such purchaser, could not relate to Willig, who had already bought the property and severed his relationship with respondent. It clearly shows that the parties intended to provide for a commission for future and not for past services. Any doubt as to that intention is removed by the Brownscombe letter: "Mr. Alex McCluskey, a broker of this city, has one or more prospective purchasers for the Rule ranch and personal property. I have advised him for his protection he should have a formal listing from the executor before making a bid in court." Since Willig at that time was known to both parties to have purchased the property subject to confirmation by the court and to have severed his relationship with respondent, he was neither a purchaser whom respondent "has" nor "one or more" purchasers nor a "prospective purchaser." The advice that respondent secure a formal listing for its own protection before "making a bid in court" undoubtedly related to the provision in section 785 of the Probate Code allowing the court in its discretion to accept a bid of at least ten per cent more than the price named in the return of sale, if made to the court by a responsible person before confirmation of the return sale. A promise of a commission in this event was not necessary as the majority opinion assumes, for section 761 of the Probate Code limits the commission to one-half only if there are two brokers, one who has procured the original purchaser, and the other who has procured the purchaser who makes the higher bid. *20 If there is only one broker, namely the one who secured the purchaser making the higher bid on which a confirmed sale is made, section 761 would not apply and the broker would be entitled to the full commission if he had secured a written contract pursuant to section 760. Moreover, it cannot be assumed that the parties believed that a written promise of a commission was unnecessary with respect to bids in court. In the absence of other authority clearly in point, Brownscombe may have relied for his advice on the statement in California Jurisprudence (11B Cal.Jur. 53 667), a widely used encyclopedia of California law, that brokers, who procure a bid in court on their own responsibility, cannot be allowed a commission out of the estate, citing Hickman-Coleman Co. v. Leggett, 10 Cal.App. 29 [100 P. 1072]; Estate of Strybing, 5 Cof.Prob.Dec. 438. The parties were properly advised to remove any uncertainty in this respect by executing the instrument in question. If respondent had intended that the instrument provide for a commission for the sale to Willig, he would have said so, assuming of course that he did not intend to lull the executors into the belief that the agreement related to the procuring of a new purchaser and to use the instrument as a basis for a claim for a commission on the Willig sales. Such an intent would be of no avail, for respondent could not attain by a trick what had been denied him when he asked for it. (Civ. Code, 1640, 1649, 1654; Code Civ. Proc., 1864; Brant v. California Dairies, Inc., 4 Cal.2d 128, 133 [48 P.2d 13]; Pacific Lumber Co. v. Industrial Acc. Com., 22 Cal.2d 410, 422 [139 P.2d 892]; McClintick v. Leonards, 103 Cal.App. 768, 774 [285 P. 351]; see 4 Cal.Jur. Ten-year Supp., 1943 revision, 135.)
 The record shows that respondent at the trial vigorously objected to the admission of the Brownscombe letter in evidence. Since he now contends that the letter was not admissible, it is necessary to determine the question whether the letter was admissible as extrinsic evidence in aid of the interpretation of the agreement of September 23, 1942. Respondent contends that the promise of a commission in the instrument of September 23rd covered the sales to Willig and that in view of the clear, common meaning of the language used, the promise cannot be otherwise interpreted. Even if it be assumed that the instrument of September 23rd would seem unambiguous to a reader unfamiliar with the circumstances surrounding its execution, appellants would not be precluded from showing the *21 meaning intended by the parties, and the court could still interpret the instrument in accord with that intention.
 The main purpose of interpretation is to give effect to the intention of the parties at the time of contracting (Civ. Code, 1636; Universal Sales Corp. v. California, etc., Mfg. Co., 20 Cal.2d 751, 760 [128 P.2d 665]; Bader v. Coale, 48 Cal.App.2d 276 [119 P.2d 763]; see 6 Cal.Jur. 255, 4 Cal.Jur. Ten-year Supp., 1943 revision, 107). This purpose would be defeated if it could not be determined what the parties meant when the language of their contract seems unambiguous to the general reader unaware of the circumstances under which the contract was executed, who bases his understanding of the language exclusively on his knowledge of the meaning of the words in common usage. (Ermolieff v. R. K. O. Radio Pictures, 19 Cal.2d 543, 550 [122 P.2d 3].) Though language that appears unambiguous to the general reader gives rise to an inference that the parties used the language in its ordinary meaning, the inference may be rebutted by evidence that the parties used the words in question in a different sense. (Code Civ. Proc., 1861; Civ. Code, 1636; Weinstein v. Moers, 207 Cal. 534 [279 P. 444]; Shean v. Weeks, 176 Cal. 592 [169 P. 231]; see McBaine, The Rule Against Disturbing the Plain Meaning of Writings, 31 Cal.L.Rev. 145, 149.) Otherwise "the meaning of the people who did not write the document" would determine its interpretation (see 9 Wigmore, Evidence, 4th ed., 2462), and the intention of the parties might be nullified (Weinstein v. Moers, supra, at p. 540) in violation of the provisions of sections 1856, 1860, 1861 of the Code of Civil Procedure and sections 1636 and 1647 of the Civil Code, which are applicable not only when an ambiguity appears to the reader from the face of the instrument, but also when there is an "extrinsic ambiguity" (Code Civ. Proc., 1856, subd. 2), namely, an ambiguity that arises when the instrument is read in the light of all the circumstances surrounding its preparation. (Pacific Indemnity Co. v. California Electric Works, 29 Cal.App.2d 260, 272 [84 P.2d 313].) As the United States Supreme Court declared in Reed v. Merchants' Mut. Ins. Co., 95 U.S. 23, 30 [24 L.Ed. 348]: "Although a written agreement cannot be varied by addition or subtraction by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible *22 to comprehend the meaning of an instrument or the effect of the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written." (See, also, Jenny Lind Co. v. Bower & Co., 11 Cal. 194, 198.)
 The extrinsic evidence admissible to furnish the preliminary knowledge necessary to an understanding of the language of the instrument comprises the evidence as to "circumstances surrounding the parties at the time they contracted ... including the object, nature and subject matter of the agreement ... and the preliminary negotiations between the parties" in order that the court may "place itself in the same situation in which the parties found themselves at the time of contracting." (Lemm v. Stillwater Land & Cattle Co., 217 Cal. 474, 480 [19 P.2d 785]; Civ. Code, 1647; Code Civ. Proc., 1860; Universal Sales Co. v. California etc. Mfg. Co., supra, p. 761.)
 The statement sometimes found in the cases that the extrinsic facts are admissible only when a written instrument is ambiguous, simply means that the language used by the parties must be susceptible to the meaning claimed to have been intended by the parties. (Balfour v. Fresno Canal & Irr. Co., 109 Cal. 221 [41 P. 876]; Smith v. Carlston, 205 Cal. 541, 550 [271 P. 1091]; Barlow v. Frink, 171 Cal. 165, 172 [152 P. 290]; Kenney v. Los Feliz Investment Co., Ltd., 121 Cal.App. 378, 386 [9 P.2d 225]; In re Smith's Will, 254 N.Y. 283 [172 N.E. 499, 72 A.L.R. 867]; Goode v. Riley, 153 Mass. 585 [28 N.E. 228]; Restatement, Contracts, 242, comment a; Holmes, The Theory of Legal Interpretation, 12 Harv.L.Rev. 417, 420.) If the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless. (See Williston, Contracts [rev. ed. 1936], 629.) In the light of the foregoing principles, the Brownscombe letter was clearly admissible.
 Since there was no written contract, as required by section 760 of the Probate Code, to pay respondent a commission on the sales to Willig, the judgment should be reversed. The rule that a broker must have a contract in order to recover for his services, however beneficial they are to the principal, is necessary to protect the principal, who otherwise would frequently be unable to determine whether the price agreed upon with the purchaser included a commission. (See Restatement, Agency, 441 Comment (c), 448 Comment (f); *23 Lasoya Oil Co. v. Jarvis, 191 Okla. 213 [127 P.2d 142, 142 A.L.R. 270]; 12 C.J.S. p. 134.) Section 760 of the Probate Code has adopted this rule, adding the requirement that the contract be in writing. This formality protects the broker from competing claims of others, and the estate from "the assertion of false claims for compensation by brokers and agents" (Kleinsorge & Heilbron v. Liness, 17 Cal.App. 534, 538 [120 P. 444]), which would otherwise be a source of litigation, that would sometimes result in the principal's paying the commission twice. (See Selvage v. Talbott, 175 Ind. 648 [95 N.E. 114, Ann.Cas. 1913 C 724, 33 L.R.A. N. S. 973]; Barney v. Lasbury, 76 Neb. 701 [107 N.W. 989]; Annotation 17 A.L.R. 891, 894.) The statute is vitiated when the courts allow a broker to recover a commission in the absence of a written contract. (White v. Hirschman, 54 Cal.App.2d 573, 574 [129 P.2d 430]; Hicks v. Post, 154 Cal. 22, 28 [96 P. 878]; Jamison v. Hyde, 141 Cal. 109 [74 P. 695]; Kleinsorge & Heilbron v. Liness, supra, p. 538.)
 Edmonds, J., concurred.