Mary Ann Horgan died testate in San Francisco August 15, 1925, leaving certain property to charitable institutions and the remainder of her estate to her heirs at law. Elizabeth O'Mahoney, respondent, petitioned the court for partial distribution, alleging she was an heir, to wit, cousin of decedent. Elizabeth A. O'Connor, assignee of Thomas O'Connor, one of the heirs, opposed the petition, denying that petitioner was such heir and alleging that the said petitioner was not related whatever to decedent. The court found that there were three heirs at law, to wit, Richard O'Connor, a cousin; Thomas O'Connor, a cousin; and Elizabeth O'Mahoney, a cousin. The petition for partial distribution was granted, and from the decree Elizabeth A. O'Connor is the only appellant. [1] She contends that the evidence is insufficient to sustain the finding that Elizabeth O'Mahoney was the cousin of decedent.
John Horgan, a native of Ireland, came to the United States prior to 1849. He was married to Bridget O'Connor, and one child was the issue of the marriage, namely, Mary Ann Horgan, decedent herein. John Horgan lived in San Francisco for many years prior to his death there in 1886. He was a blacksmith. Mary Ann Horgan was never married.
Respondent gave testimony, by deposition, of many particular facts of family history, relationship, descent, birth, marriage, and death connected with and concerning the family of herself and decedent which, she testified, she learned from her father. Among other things, she testified that her father's name was Patrick Horgan and his brother's name was John; that their father's name was John Horgan *Page 38 
and their mother's name was Johanna Horgan, nee Flynn; that her uncle, John Horgan (father of decedent), was a blacksmith by trade. She testified that she based her statements as to those matters upon, to quote the witness, "talks I had from time to time with my father"; "information passed on to me from my father," "family knowledge and from information given to me by my father during his lifetime." Some of the answers, for example, given by respondent were: "The decedent never married, as my father in his lifetime always told me," "I always heard my father say that decedent was an only child." Respondent further testified in various parts of the deposition, both in answer to interrogatories and cross-interrogatories, that she and decedent were "first cousins"; that "her father and my father were brothers," and that she learned this, as she stated, "from what my father used to tell me."
No objection was made to any question, nor was there any motion made to strike out any answer or any part of the deposition. In fact; the deposition of respondent was read in evidence with the consent of counsel for appellant expressed in open court. Appellant now contends that the answers of respondent were not declarations within the meaning of the hearsay rule; that they have no evidentiary value and should not have been considered by the trial court in determining the issue, for the reason that they were simply opinions of the witness.
[2] Declarations of a member of a family made ante litemmotam, the declarant being deceased at the time of the giving of the testimony, may be received in evidence for the purpose of proving pedigree (Estate of Williams, 128 Cal. 552 [79 Am. St. Rep. 67, 61 P. 670]; Estate of Hartman, 157 Cal. 206 [21 Ann. Cas. 1302, 36 L.R.A. (N.S.) 530, 107 P. 105]). Section 1852 of the Code of Civil Procedure provides: "The declaration, act or omission of a member of a family who is a decedent, or out of the jurisdiction, is also admissible as evidence of common reputation, in cases where, on questions of pedigree, such reputation is admissible." It is further provided that evidence may be given of "the act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage or death of any person related by blood or marriage to such deceased person" and of "common reputation existing previous *Page 39 
to the controversy . . . in cases of pedigree." (Code Civ. Proc., sec. 1870, subds. 4 and 11.)
"Pedigree is the history of family descent, which is transmitted from one generation to another, by both oral and written declarations, and, unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. Matters of pedigree consist of descent and relationship evidence by declarations of particular facts, such as births, marriages and death." (Italics ours.) (Jones' Commentaries on Evidence, vol. 2, sec. 312.) To the foregoing is added by Greenleaf (16th ed., vol. 1, p. 202): ". . . as well as, in general, any notable fact in the life of a member or in the family history which might well be supposed to be known to the members in general." Mr. Wigmore says: "The evidence may be in the form of individual declarations; though it may also be in the form of family reputation. In general, the scope of the present exception has been much enlarged during the past century in this country. Occasionally a statute has attempted to define its terms." Under this statement a reference is made to the California statutes above mentioned (Wigmore on Evidence, sec. 1480).
In Watson v. Brewster, 1 Pa. St. 381, a witness, through interrogatories, was asked: "Are you acquainted with the age of Mrs. Watson? If so, when was she born? State how you know her age. State is she older or younger than yourself. If so, how much?" The defendants objected to the testimony on the ground that it appeared that the witness spoke from recollection of the contents of the family Bible. The plaintiff contended "that the witness recollected it from information received from her deceased mother." The court said: "The witness knows the age of her sister from the declarations of her mother, who is deceased. Now, that this species of evidence must be admitted has always been held, for otherwise a person could not prove his own age, for where no family record is made he can only show it from the declaration of his parents or others cognizant of the fact."
The question in the present case does not concern the admissibility of testimony. As heretofore pointed out, it was received into the record without objection and was before the court (Estate of Friedman, 178 Cal. 27 [172 P. 140]). We find no merit in the contention that such evidence was without evidentiary value. *Page 40 
In addition to the testimony hereinbefore referred to, there were introduced in evidence on behalf of respondent certificates of baptism which stated that a certain John Horgan, born of John Horgan and Johanna Flynn, was baptized in the parish of Doneraile and Shanballymore (Ireland) on September 3, 1820; and that one Patrick Horgan, born of John Horgan and Johanna Flynn, was baptized in the same parish May 18, 1823.
Thomas O'Connor, one of the heirs at law, a witness for appellant, testified that he was born in the parish, as he called it, of "Doneraile or Shanballymore, if you will"; that he knew Mary Ann Horgan, the decedent, and her father John Horgan; that he visited John Horgan and his family in San Francisco in 1876; that John Horgan questioned him at length about certain persons by the name of Flynn who lived in Ireland; that he (O'Connor) knew the said Flynns; that he learned that these Flynns were the first cousins of John Horgan; that he was informed of this relationship by John Horgan's wife; that his (O'Connor's) home was about one-fourth of a mile from where respondent, Elizabeth Horgan (now O'Mahoney) and her father, Patrick Horgan, resided; that "I could not say where John Horgan, the father of Mary Ann Horgan, was born, but I know he kept a blacksmith shop in a place called Carker Pike; that was one mile from where I lived — from where I was born. Carker Pike is two miles east of Doneraile; it was one mile from where I was born and lived."
Questions of fact for the trial court to determine were: Did respondent, who lived near Doneraile, county of Cork, Ireland, have an uncle named John Horgan? If so, was he the same John Horgan (father of decedent) who died in San Francisco in 1886, but who was born in Ireland and who at one time had a blacksmith shop near Doneraile in said county of Cork? These questions were answered in favor of respondent.
[3] Identity of person is presumed from identity of name. (Code Civ. Proc., sec. 1963, subd. 25; Estate of Williams,128 Cal. 552 [79 Am. St. Rep. 67, 61 P. 670].)
In the Estate of Williams, supra, the court, after observing that the presumption arising from identity of name is rebuttable, said: "The question was one of fact, and there was certainly sufficient evidence to justify the court in finding *Page 41 
that the petitioners were the nephews of the testator, and entitled to the whole of the residuary estate, if George Williams died before the testator, leaving no issue. Upon this point the declaration of William Frederick Williams, deceased, as to the family understanding and belief to the effect that he enlisted in the army when a boy on the federal side of the civil war, and was believed to have been killed, and that he never married, was competent evidence and sufficient to sustain the finding of the court. . . . but it was for the trial court to determine the weight to be given to each and every particular statement, and I am satisfied with the correctness of its conclusions."
We are of the opinion, after a scrutiny of the entire record, that there was sufficient evidence to sustain the finding of which appellant complains.
[4] Appellant makes a specification of error regarding the admission in evidence of the above-mentioned certificates of baptism. The record shows that the appellant made an objection when the certificates were first offered, on the ground that they were not properly authenticated. The court did not rule upon the objection as, apparently from the record, it was deemed withdrawn. When the certificates were again offered there was no objection.
Judgment affirmed.
Tyler, P.J., and Knight, J., concurred.
A petition for a rehearing of this cause was denied by the district court of appeal on July 28, 1928, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 27, 1928.
All the Justices present concurred. *Page 42