[Civ. No. 10643. First Appellate District, Division One.—August 24, 1939.]

In the Matter of the Estate of FRANK PATERSON, Deceased. NORMAN N. BLAKELY et al., Appellants, v. ROSINA LUISE LODER et al., Respondents.

Rittenhouse & Rittenhouse and Bert B. Snyder for Appellants.

Wyckoff, Gardner & Parker for Respondents.

PETERS, P. J.—This is an appeal from the judgment and decree of the superior court establishing heirship in a proceeding under section 1080 of the Probate Code in the estate of Frank Paterson. The court found the only surviving heirs at law and next of kin of Paterson to be Rosina Luise Loder née Dick, Marie Elise Pauli née Dick, and Rosina Ponte née Dick. These respondents are admittedly related to Paterson on his mother's side in the fifth degree. The appellants, Norman N. Blakely, Samuel Blakely and Margaret Daly, are admittedly related to Paterson on his father's side in the eighth degree. The trial court found against another claimant—one Fritz Weyeneth-Marolf—and he has not appealed. It is the theory of appellants that, although they are admittedly further removed in relationship from the decedent than are respondents, they are Paterson's lawful next of kin for the reason that respondents are descendants of an illegitimate grandmother, Anna Maria Weyeneth. It

is contended that an illegitimate ancestor cannot act as a conduit for purposes of inheritance under the laws of this state.

The trial court, in dealing with the claims of respondents and appellants, made no express finding as to the legitimacy of Paterson's grandmother. It simply found that "Frank Paterson left him surviving as his only heirs of law" the respondents; "that the relationship of each of said three last-mentioned claimants to said deceased is in the fifth degree." As to appellants, the court found that their relationship "to said deceased, if any, is that of second cousin once removed, and is a relationship in the eighth degree."

Respondents first contend that the evidence as to the legitimacy of Anna Maria was conflicting, and that, therefore, the finding as to relationship is amply supported on the theory that she was legitimate. An examination of the record indicates that upon the trial the great mass of the evidence introduced by both appellants and respondents on the issue of kinship was hearsay, and that all the evidence relating to the legitimacy of Anna Maria Weyeneth was hearsay. All of this testimony was admitted without objection and by stipulation of the parties. There are several affidavits which contain general language which indicates that Anna Maria Weyeneth was the legitimate daughter of Elizabeth Suter. The evidence to the contrary, however, is practically overwhelming. Moreover, the record shows that the cause was tried on the theory that Anna Maria Weyeneth was illegitimate. The record also shows that in the trial court's order determining heirship, in denying the claims of Fritz Weyeneth the court stated:

"The petition of Fritz Weyeneth is denied upon the ground that the evidence is legally insufficient to establish that his ancestor Anna Maria Weyeneth was legitimated by the several acts of her father relied on by said petitioner. . . . "

Under such circumstances it must be held that Anna Maria Weyeneth was found by the trial court to be illegitimate, and that respondents may recover, if at all, only upon the theory that an illegitimate ancestor may act as a conduit for purposes of inheritance.

The right of inheritance being statutory, the solution of this problem is obviously one of construction. The pertinent statutory provisions are as follows:

Section 226 of the Probate Code provides in part:

"If the decedent leaves neither issue, spouse, parent, brother, sister, nor descendant of a deceased brother or sister, the estate goes to the next of kin in equal degree, . . . "

Section 255 of the Probate Code provides:

"Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father; and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock; but he does not represent his father or mother by inheriting any part of the estate of the parent's kindred, either lineal or collateral, unless, before his death, his parents shall have intermarried, and his father, after such marriage, acknowledges him as his child, or adopts him into his family; in which case such child is deemed legitimate for all purposes of succession."

Section 256 of the Probate Code provides:

"The estate of an illegitimate child, who, having title to any estate not otherwise limited by marriage contract, dies without disposing thereof by will, is succeeded to as if he had been born in lawful wedlock, if he has been legitimated by a subsequent marriage of his parents or adopted by his father as provided by the Civil Code; otherwise, it is succeeded to as if he had been born in lawful wedlock and had survived his father and all persons related to him only through his father."

For convenience in considering the claims of respondents the following diagram graphically illustrates the problem involved:

COMMON ANCESTOR ELIZABETH SUTER (Had one illegitimate daughter, then married Dick and had legitimate children)

Anna Maria Weyeneth (Illegitimate; married Aeby) — Rudolf Dick (Legitimate) — Fred Dick (Legitimate) — Jacob Dick (Legitimate)

Maria Louisa Aeby (Legitimate; married Robt. Paterson) — Marie Elise Pauli nee Dick (Legitimate) — Rosina Luise Loder nee Dick (Legitimate) — Rosina Ponte nee Dick (Legitimate)

(RESPONDENTS)

Frank Paterson (Legitimate; decedent)

If the inheritable line can properly ascend through Anna Maria Weyeneth to Elizabeth Suter, and through her to

respondents, it is obvious that respondents are related to decedent Paterson in the fifth degree under the provisions of section 251 of the Probate Code.

■ It is the contention of appellants that at common law an illegitimate child had no inheritable blood so far as his ancestors were concerned. This was undoubtedly true. The applicable principle has been stated by Blackstone, Cooley's fourth edition, volume 1, page 633, as follows:

"Bastards are incapable of being heirs. Bastards, by our law, are such children as are not born either in lawful wedlock, or within a competent time after its determination. Such are held to be *nullius filii,* the sons of nobody; for the maxim of law is, *qui ex damnato coitu nascuntur, inter liberos non computantur* (those who are the offspring of an illicit connexion are not reckoned as children). Being thus the sons of nobody, they have no blood in them, at least no inheritable blood; consequently, none of the blood of the first purchaser; and therefore, if there be no other claimant than such illegitimate children, the land shall escheat to the lord."

And again at page 634 it is stated:

"As bastards cannot be heirs themselves, so neither can they have any heirs but those of their own bodies. For as all collateral kindred consists in being derived from the same common ancestor, and as a bastard has no legal ancestors, he can have no collateral kindred; and, consequently, can have no legal heirs, but such as claim by a lineal descent from himself."

The rationale of this doctrine is clear. At common law illegitimates are the sons of nobody. They have no inheritable blood in them. They cannot be heirs, nor can they have heirs save those of their own body. Since an illegitimate can have no legal ancestors, he could, of course, have no collateral kindred.

In this state the common law is applicable unless changed by statute (sec. 4468, Pol. Code), so that the sole question presented is whether the above common law rules have been changed by the above-quoted statutes. An examination of sections 255 and 256 of the Probate Code, *supra,* demonstrates that these statutes of succession, generally speaking, with respect to the maternal line, have bestowed upon an illegitimate child the same inheritable blood as have legitimate

offspring, and, subject to the limitations therein contained, provide that such illegitimates may inherit and transmit property in the same manner as legitimates. To illustrate: The opening clause of section 255 makes the illegitimate the heir of his mother—thus repudiating the common law rule to the contrary. The last clause of section 256 provides that the illegitimate is endowed with inheritable blood precisely the same as that of a legitimate child, insofar as the devolution of his estate to his mother and through her to collateral kindred is concerned. This section provides, in effect, that as to all relationships except those arising from his father, the illegitimate's property is to be inherited as if he were legitimate. The doctrine of the common law that he has no inheritable blood has thus been abolished in this respect. That these sections have entirely changed the common law rules relating to the capacity of illegitimates to inherit and to transmit inheritance was expressly held in *Estate of Wardell*, 57 Cal. 484. In that case a testatrix died leaving surviving two legitimate sons, mentioned in the will, and an illegitimate daughter not mentioned in the will. The question presented was whether such illegitimate child was a pretermitted heir under the terms of section 1307 of the Civil Code (now substantially embodied in sec. 90 of the Probate Code). That section provided that "when any testator omits to provide in his will for any of his *children* . . . unless it appears that such omission was intentional, such *child* . . . must have the same share of the estate of the testator as if he had died intestate. . . . " The contention was made that the terms "children" and "child" as used in this statute included only legitimate children, on the ground that at common law such terms referred only to legitimate children. The court, while conceding this to be true at common law, pointed out that illegitimates under the laws of this and other states have been made (p. 491) "capable of inheriting and transmitting inheritance". After referring to section 1387 of the Civil Code from which section 255 of the Probate Code was substantially copied, the court pointed out (p. 491) that: "the State has regulated the inheritable capacity of all children illegitimate by birth". In holding that an illegitimate was a child within the meaning of Civil Code section 1307 the court stated (p. 492):

"The respondent was, therefore, though illegitimate by birth, endowed by the statute with inheritable blood. She possessed the same heritable rights as heir of her mother, as if born in lawful wedlock. (*Rogers* v. *Weller*, 5 Biss. 166 [Fed. Cas. No. 12,022] ; *Garland* v. *Harrison*, 8 Leigh, (35 Va.) 368; *Bennett* v. *Toler*, 15 Gratt. (56 Va.) 588 [78 Am. Dec. 638].) As an heir of her mother, she differed nothing in law from the other children, so far as the rights of inheritance which had been conferred upon her by law. To the full extent of those rights she was entitled to all the privileges and immunities of heirship. If her mother had died intestate, her right to a distributive share of the estate would have been unquestionable. Dying testate, the legal relation between mother and daughter was not impaired or destroyed. The latter was still a legitimate heir, as much so as the children legitimate by birth, for the law made her and (*sic*) heir to the same extent 'as if she had been born in lawful wedlock.'

"It is not to be supposed that the law which attached to her person the rights and duties of inheritance, and endowed her with the capacity to exercise them, meant to leave her a bastard, under the disabilities of the common law, if the mother unintentionally omitted to make provision for her in her will. When placed by law in the state and condition of heir, and invested with the character and capacity of heir, *all the rights, privileges, and legal consequences incident to that relation were tacitly conferred upon her.*"

The same general reasoning applies here. Section 226 of the Probate Code, above quoted, provides that the property of the decedent here involved must go to his "next of kin in equal degree." Appellants argue that the grandchildren of Elizabeth Suter, by Dick, who is the great grandmother of decedent, are not Paterson's next of kin because Paterson's grandmother, Anna Maria, was illegitimate. Stated another way, it is urged that the phrase "next of kin" must be interpreted to mean legitimate next of kin. This contention must be predicated on the theory that an illegitimate has no inheritable blood for the purpose of taking or transmitting property—the reason behind the common law rule already discussed. Under sections 255 and 256 of the Probate Code, *supra,* that doctrine has been abolished. When the reason for a rule ceases, the rule should

cease. (Civ. Code, sec. 3510.) Next of kin simply means those upon whom, under the circumstances defined in section 226 of the Probate Code, the law has conferred the right to inherit the property of one who dies intestate. Under section 256 an illegitimate is endowed, for the purpose of transmission of his property, with the same inheritable blood as that of a legitimate, as therein limited. His own heirs, as therein limited, are the same as those of a legitimate. There can be no doubt that had Anna Maria, the illegitimate grandmother of decedent, been living at his death, and had Paterson left no issue, spouse, parent, brother, sister, or descendant of a deceased brother or sister, that Anna Maria would have inherited her grandson's property under section 226. But the inheritable bloodstream does not end with her. Under the provisions of section 256 she, although illegitimate, has been endowed with inheritable blood as if she "had been born in lawful wedlock" and had survived her father. Without doubt, the great grandmother of Paterson, the mother of Anna Maria, Elizabeth Suter, would be the heir of Anna Maria. If Anna Maria had been legitimate it is obvious Elizabeth Suter would be the next of kin of Paterson had she survived under the circumstances set forth in section 226. Stated another way, the phrase "next of kin" in section 226, just as the term "children" in section 90 of the Probate Code, by reason of the provisions of section 256 must be interpreted to include those in the illegitimate line as well as in the legitimate line.

Appellant urges that section 256 applies only where the estate of an illegitimate is before the court. This contention is without merit. We are here dealing with the interpretation of the phrase "next of kin" in section 226. Section 256 is looked to simply to ascertain the degree to which the legislature has conferred inheritable blood on illegitimates. It must be held that by these various sections the legislature has seen fit to unite the family tree of the illegitimate with that of his mother.

Apparently there is no case in this jurisdiction directly holding that the mother of an illegitimate, or her descendants, are next of kin and may thus inherit from the legitimate descendants of an illegitimate. The principle, however, has been applied in analogous situations. It has been directly held in the *Estate of Magee*, 63 Cal. 414, that an illegitimate

may act as a conduit for purposes of inheritance. This case refutes appellants' theory, and necessarily refutes the strict limited interpretation they seek to place on section 256. In the Magee case, Suez Magee died intestate. She was an illegitimate daughter of Susan Magee, who predeceased her. Susan Magee had another illegitimate daughter, the half sister of the deceased, named Elizabeth Magee, who also predeceased the decedent. Elizabeth left surviving a legitimate son, Albert Redmond. Albert, therefore, if he could properly use his illegitimate mother Elizabeth as a conduit for purposes of inheritance, was related to the decedent in the third degree. It was held that Albert inherited the estate as against the claims of others related to the decedent in the fourth degree entirely through legitimate ancestors. In other words, it was held that under our statutory law, the legitimate child of an illegitimate, through his grandmother *and illegitimate mother*, could inherit the estate of the illegitimate half sister of his mother. Although it is true that in this case the estate of an illegitimate was before the court, the importance of the case is that it holds that the illegitimate mother of Albert could be used as a conduit through which Albert could inherit. The reasoning by which this conclusion was reached is instructive in the present case. At page 415 it is stated:

''According to section 1388, Civil Code, if any illegitimate child (not acknowledged or adopted by his father) dies intestate, without lawful issue, his estate goes to his mother, or, in case of her decease, to her heirs at law. Suez Magee was illegitimate; she died intestate; Susan, her mother, had died before her; therefore, upon the death of Suez, the property of the latter was to go to the heirs of the mother, Susan. The next question, then, is who are the heirs of Susan? Section 1387, Civil Code, we think, answers the inquiry. Every illegitimate child *is in all cases* an heir of his mother, and inherits *in the same manner as if born in lawful wedlock.* There is no question as to the heirship of Albert E.; he is the legitimate son of his mother, Elizabeth. She (Elizabeth) was the illegitimate daughter of Susan. By section 1387, just referred to, Elizabeth was the heir of her mother, in the same manner as if born in lawful wedlock. If, then, Elizabeth had been born in lawful wedlock, she would unquestionably have been heir of her mother; being born out of wedlock, she is by the statute made heir of her mother in

the same manner as if born in wedlock. Being, then, the heir of her mother, and dying leaving issue, the property of Suez goes to such issue; not because the issue is heir of Suez, but is heir of Susan.''

And again at page 416 it is stated:

''If Elizabeth had died intestate and without issue, doubtless the estate of Suez would have gone to the Cunninghams, as the heirs of Susan, the mother of Elizabeth and Suez; but as Albert E. is, through his mother, Elizabeth, the heir of Susan, he is entitled to the estate of Suez—not, perhaps, because he is the heir of Suez, but because he is the heir of the mother of Suez, and as such is, under the statute, entitled to take.''

Thus *Estate of Magee, supra,* holds that the son of an illegitimate mother may inherit through that mother the estate of a descendant of his maternal grandmother. That is the converse of the situation presented in the instant case. But the same reasoning applies. If the above premise is sound, and it has been reaffirmed in *Estate of De Cigaran,* 150 Cal. 682 [89 Pac. 833], and *Estate of Smith,* 2 Cal. (2d) 652 [42 Pac. (2d) 1011], it would seem to follow that the estate of a descendant (Paterson) of an illegitimate (Anna Maria) may be inherited by the mother of the illegitimate (Elizabeth Suter) or her descendants (respondents). If the illegitimate can act as a conduit going in one direction it would seem to necessarily follow that she can act as a conduit going in the other direction. Any other conclusion would be extremely illogical. The real question in each situation is whether the common law rule depriving the illegitimate of inheritable blood has been changed in this state, so that an illegitimate can act as a conduit for purposes of inheritance. The Magee case holds that it has. The language in the Magee case concerning the limitation upon the inheritable blood of an illegitimate in section 255 of the Probate Code is not here applicable. There is no such comparable limitation in section 256 with which we are here concerned. If under section 255 as held in the Magee case, the illegitimate may act as a conduit from his mother to his children—if his children may inherit from his mother through him, it follows that by section 256 the illegitimate may act as a conduit from his descendants to his mother. If by section 255 his descendants are permitted to inherit through him from his mother, it must

follow that by section 256 his mother may inherit from his descendants because by that section she is made his heir.

To summarize: Clearly, Anna Maria was entitled to inherit from her legitimate descendants, and as such she, if living, would have been the next of kin of Paterson. This being so, section 256 operates in favor of Anna Maria's mother, Elizabeth Suter, and her descendants—respondents here.

Appellants rely on three cases as establishing a contrary rule—*Curtis* v. *Hewins*, 52 Mass. (11 Metc.) 294, *Hardesty* v. *Mitchell*, 302 Ill. 369 [134 N. E. 745, 24 A. L. R. 565], and *Sanford* v. *Marsh*, 180 Mass. 210 [62 N. E. 268]. It must be conceded that these three cases interpreted statutes substantially similar to the ones here involved contrary to the interpretation here made. The Curtis case contains little or no discussion. The Hardesty case is predicated on the Sanford case. The underlying reasoning of the Sanford case is disclosed in the following quotation. At page 268 it is stated:

"The case before us is not within the language of the statute, for we are not dealing with the estate of an illegitimate child, but with the estate of the daughter of an illegitimate child, who had deceased before the daughter. *The question is whether the statute shall be construed strictly,* or whether we discover in it a purpose to place all persons claiming through an illegitimate relation in the same position as if there were no illegitimacy in reference to the distribution of the property of persons dying intestate who are descended from an illegitimate ancestor. By the common law a bastard is *nullius filius.* He can be the heir of no one, nor have heirs, except of his own body. He has no ancestors from whom any inheritable blood can be derived. The common law on this subject is in force in Massachusetts, except as it has been changed by the statutes. *The statutes which have been adopted here have all been construed strictly. . . . We see no good reason for departing from the rule that statutes of this kind are to be construed strictly."*

This is not the rule of construction in this state. Section 4 of the Code of Civil Procedure now reads, and has so read since 1872, that:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state re-

specting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects and to promote justice."

Section 2 of the Probate Code provides:

"The provisions of this code, so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments."

In the Magee case section 255 was given such liberal construction. We must give the same liberal construction to section 256. The Magee case is opposed in theory to the above three cases. The rule of the Magee case is followed generally (see *Foster* v. *Lee,* 172 Ala. 32 [55 So. 125, Ann. Cas. 1913C, 1335]; *Bales* v. *Elder,* 118 Ill. 436 [11 N. E. 421]; *McKellar* v. *Harkins,* 183 Iowa, 1030 [166 N. W. 1061]; *Sutton* v. *Sutton,* 87 Ky. 216 [8 S. W. 337, 12 Am. St. Rep. 476]; *In re Cameron's Estate,* 170 Mich. 578 [136 N. W. 451, 40 L. R. A. (N. S.) 516].)

For the foregoing reasons the judgment and decree appealed from should be and each is affirmed.

Knight, J., and Ward, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 23, 1939.