[Civ. No. 6058. Fourth Dist. May 26, 1960.]

Estate of CORA NIDEVER, Deceased. GRACE WILLIAMS et al., Appellants, v. CHARLES C. BINKLEY, Respondent.

Aye & Shipe, George Aye, Jr., Crossland, Crossland & Richardson, William C. Crossland, Loeb & Loeb and Herman F. Selvin for Appellants.

L. Nelson Hayhurst and Irvine P. Aten for Respondent.

SHEPARD, J.—This is an appeal from that portion of a "Decree Determining Interest in Estate," which decrees that Charles C. Binkley is a half-brother of intestate (Cora Nidever) and entitled to succeed to one-half of her estate, thus leaving appellants, as heirs of Almira Binkley Titherington (a predeceased sister of the intestate), to succeed per stirpes to the other half of the estate.

The rule is too well settled to require discussion that on an appeal this court is required to view the evidence in the light most favorable to sustain the judgment of the trial court, and where there is substantial evidence or proper inference from the evidence to support the findings of the trial court, this court, on appeal, will not make factual de-

terminations contrary to those of the trial court. (*Smith v. Bull*, 50 Cal.2d 294, 306 [11] [325 P.2d 463]; *Jackson v. Burke*, 124 Cal.App.2d 519, 521 [4] [269 P.2d 137].) Viewing the evidence in this light, the record before us shows: that Joseph Binkley was the common ancestor of all the present parties litigant; that he was first married to Hester Randall and later to Anna Lewis; that from his union with Hester there issued four children, Cora Nidever (intestate herein), Almira Titherington, Andrew Binkley, and Milton Binkley; that Andrew and Milton (both without issue) predeceased the intestate; that Almira also predeceased the intestate but left five children, Grace Williams, Edith Stewart, Bruce Adams, Leroy Titherington, and Neva Robinson; that Neva Robinson also predeceased the intestate but left three children named Ruby Palmer, Joe Robinson, and Dorothy Robinson; that there are thus left as collateral heirs of the intestate through Joseph and Hester, only the children and grandchildren of Almira; that from Joseph's union with Anna there resulted two children, Charles C. Binkley and Johnson Binkley; that Johnson (without issue) also predeceased the intestate; that there is thus left as the collateral heir through Joseph and Anna, only Charles C. Binkley. By their verdict the jury found and the court in its judgment decreed that one-half of the estate belongs to Almira's heirs and one-half of the estate belongs to Charles C. Binkley, subject to administration.

There was evidence that Joseph Binkley was married to Anna Lewis August 16, 1880, in Indiana; that Hester divorced Joseph December 17, 1880; that Joseph and Anna were divorced February 21, 1895; that Charles C. Binkley was born to Anna and Joseph August 16, 1885; that Joseph lived in Ohio and Indiana, with one of these two wives, during the 1870's and 1880's; that the law of Indiana at that time provided that where one of the parties to a defective marriage believed, in good faith, that the marriage was valid, children born during such good faith belief are legitimate.

PENSION DECLARATIONS ADMISSIBILITY

On their appeal, the heirs of Almira contend that the trial court erred in admitting into evidence certain written declarations by or on behalf of Anna and Hester Binkley to the United States Government by which each claimed, for the purpose of securing a pension from the Government of the United States, to be the widow of Joseph Binkley. Ap-

pellants contend in this respect that the exception to the hearsay rule through which such document-contained declarations are permitted, i.e., declarations of the family members respecting pedigree, restricts such declarations to those in which the declarant had no reason, motive or temptation to do anything but speak the truth. They reason that such declarations were not admissible in the action here at bar because they were made at a time when a controversy existed over the precise question of fact with respect to which declaration was made, it appearing that such declarations concerned the contentions of both Hester and Anna that they were the surviving widows of Joseph Binkley, a civil war veteran, and as such were entitled to pensions. They cite in support of their appeal on this point, such authorities as *Peterson* v. *Peterson*, 121 Cal.App.2d 1, 11 [12] [262 P.2d 613]; *Byers* v. *Wallace*, 87 Tex. 503 [28 S.W. 1056]; *Lee Choy* v. *United States*, 49 F.2d 24; *Mentz* v. *Town of Greenwich*, 118 Conn. 137 [171 A. 10]; *Berkeley Peerage Case*, 4 Camp. 402, 171 Eng. Rep. 128; *Whitelocke* v. *Baker*, 13 Ves. 511, 33 Eng. Rep. 385; *Estate of Hartman*, 157 Cal. 206 [107 P. 105, 21 Ann.Cas. 1302, 36 L.R.A.N.S. 530]; *Davis* v. *Moyles*, 76 Vt. 25 [56 A. 174]; *Rollins* v. *Wicker*, 154 N.C. 559 [70 S.E. 934]; *Sugrue* v. *Crilley*, 329 Ill. 458 [160 N.E. 847]; *Succession of Anderson*, 176 La. 66 [145 So. 270]; *Proofs of Facts of Family History*, Professor Wm. G. Hale, 2 Hastings Law Journal 1; and Wigmore on Evidence, 3d edition, volume 5, section 483, page 300; and *Turney* v. *Sousa*, 146 Cal.App.2d 787 [304 P.2d 1025].

The terminology of the various authorities in the statement of the rule and the incidental comments respecting the proper application of the rule in some of its more extended aspects appear to reflect some diversity. The classic statement of the rule from the common law as given by Lord Eldon is quoted in the Whitelocke case, wherein it is stated:

". . . declarations in the family, descriptions in Wills, descriptions upon monuments, descriptions in Bibles and Registry Books, all are admitted upon the principle that they are the natural effusions of a party who must know the truth, and who speaks upon an occasion when his mind stands in an even position, without any temptation to exceed or fall short of the truth."

Professor Hale, in his treatise, *supra,* speaks of it in the following language: "The inventive genius of the Common Law brought into being the pedigree exception to the hearsay

rule to meet, in part, the foregoing necessities. The exception, with somewhat varying specific requirements, goes back a considerable distance in England, and is recognized throughout the American Jurisdictions.

"The evidence offered under the pedigree exception may take either of two forms. It may be evidence: (1) of a hearsay declaration by a specific declarant, or (2) evidence of family reputation. If it is a specific declaration, the declarant (1) must have been a member of the family; (2) must be unavailable as a witness, and (3) must have made his statement under circumstances that furnish a reasonable probability of its trustworthiness or more accurately, as the law has developed, under circumstances that do not throw too much suspicion on its credibility."

Professor Wigmore, *supra,* analyzes what he views as the reasonable requirement of the rule, as follows:

At page 205: "a. Where the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed;

"b. Where, even though a desire to falsify might present itself, other considerations, such as the danger of easy detection or the fear of punishment, would probably counteract its force; .

"c. Where the statement was made under such conditions of publicity that an error, if it had occurred, would probably have been detected and corrected."

At page 299: "Principle requires, however, that the dispute, if it is to exclude the statements, should have been more or less over *the precise point to which the statements refer*; else no bias could be supposed to affect it. There is opportunity for much latitude in applying this limitation. Judges' opinions have differed; but it should be a matter for the trial Court's discretion whether under the circumstances of each case a bias can be supposed to have existed:" (Emphasis given by Wigmore.)

At page 301: "Cautions have more than once been given to avoid excluding evidence merely because there *might* have been a bias:

"1847, L. C. J. Denman, in *Doe* v. *Davies,* 10 Q.B. 325: '(A declaration in a deed) was objected to on account of the interest they had had in making out things to be as there represented, and at least this intention of disposing of property was said to be equivalent to a "lis mota". But we think this objection also fails . . . The parties did what they

had a right to do if members of the family. Almost every declaration of relationship is accompanied with some feeling of interest, which will often cast suspicion on the declarations, but has never been held to render them inadmissible.' "

On the subject of whether or not the declaration was made at a time when a controversy existed respecting the precise point on which the declaration was made, the terms "*lis mota*," "*ante litem motam*" and "*post litem motam*" are used. Jones on Evidence, 5th edition, volume 2, page 548, discusses the meaning of these terms and their application, saying:

"Sec. 288.—Meaning of 'Ante Litem Motam.'—The rule being, as above stated, that the proffered statement, in order to be admissible, must have been uttered ante litem motam, it becomes necessary to determine the point of time to which the words 'lis mota' refer. This expression is used in a broad sense; it signifies the beginning of a controversy or dispute, and not the commencement of a suit. The contention has sometimes been made that no actual controversy need have arisen, the meaning of the term 'lis mota' being simply the arising of the state of facts on which the claim is founded. However, it is the settled rule that there must be, not only facts which may lead to a dispute, but a suit or a controversy preparatory to a suit, upon the same subject matter as that which is involved in the litigation."

Corpus Juris Secundum, volume 31, page 975, attempts to state the rule in the following language: "However, it is not material that the parties had had a mere difference; that there had been an unrelated controversy; that a controversy had arisen regarding a cognate matter, unless it clearly foreshadowed one on the precise subject matter of the declaration; that a controversy, since entirely abated, once existed; or that a state of affairs was known to exist out of which a controversy might at any time arise."

In *Estate of Hartman,* 157 Cal. 206 [107 P. 105, 21 Ann.Cas. 1302, 36 L.R.A. N.S. 530], the court, in discussing the question of whether or not other evidence than the declarations should be required before the declarations be admitted, quotes from treatises on Evidence by Taylor, by Wharton and by Wigmore, and comments in part, at pages 210 and 212, as follows:

". . . it seems absurd to require, as a foundation for the admission of the declaration, proof of the very fact which the declaration is offered to establish. The preliminary proof would render the main evidence unnecessary. There are state-

ments in the cases which seem to recognize a rule thus rigid and absurd . . .

"This surely cannot affect the evidential value of the declarations; for that must depend on the circumstances at the time of making, and no one has ever contended that, apart from the *lis mota* and kindred limitations . . . it makes any difference whether a parent belongs to a poor or obscure branch of the family or to a rich and notorious one. . . .

"The confusion seems to have arisen from the idea that such declarations were competent as admissions against interest. They do not derive their evidential value or competency from that consideration. They are admitted from reasons of necessity, because otherwise it would frequently be impossible to prove the kinship of members of a family after those who knew the facts are dead."

In *Peterson* v. *Peterson, supra,* page 11, the following statement is made: "It is of course true that declarations of pedigree by those in the family group are generally admissible to prove facts of family history. But there are limitations on this exception to the hearsay rule. If a controversy or a motive to deceive exists when such declarations are made they are then inadmissible. They are then self-serving hearsay."

■ From an examination of the plethora of authorities cited in the briefs and by the various law writers, it would seem clear that insofar as oral statements are concerned the majority rule clearly holds to the restrictions recited by Lord Eldon and that a statement to be admissible must have been made *ante litem motam,* that is, at a time when no controversy existed on the precise point of which the declaration was made. It is true a wide variation of the exact application of the rule is to be found due to the strenuous efforts of the courts to administer justice fairly in accordance with the particular facts of each individual case.

■ It is to be noted, however, that the Legislature of California, in its wisdom did not, in direct terms, place the restriction of *ante litem motam* on such declarations, for its language recorded in Code of Civil Procedure, section 1870, is as follows:

"4. The act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person;

"11. Common reputation existing previous to the controversy . . . in cases of pedigree . . ."

Section 1852 provides: "DECLARATION OF DECEDENT EVIDENCE OF PEDIGREE. The declaration, act, or omission of a member of a family who is a decedent, or out of the jurisdiction, is also admissible as evidence of common reputation, in cases where, on questions of pedigree, such reputation is admissible."

Thus by the direct literal wording provided by our Legislature, such declarations would be admissible even though *post litem motam,* and it is only by judicial interpretation that the more rigid restriction of *ante litem motam* has been carried forward into our California law.

However, there is a much firmer foundation under which, in our opinion, the declarations were admissible, to wit, the ancient document rule. There appears to be no question that the documents qualify as ancient documents. It is clear that common reputation is admissible to show pedigree (Code Civ. Proc., 1870, subd. 11.), "common reputation existing previous to the controversy . . . in cases of pedigree. . . ." (*Estate of Flood,* 217 Cal. 763, 776 [5] [21 P.2d 579].)

The weight of authority clearly holds that ancient documents are admissible to show common reputation, including that concerning pedigree, heirship, widowhood, and identity of persons. (32 C.J.S. 662; Code Civ. Proc., § 1870, subd. 13; *Estate of Braig,* 43 Cal.App.2d 385 [110 P.2d 1066].)

It is also true that the weight of authority in California is that ancient documents may be received as proof of facts recited therein. (*Kirkpatrick* v. *Tapo Oil Co.,* 144 Cal.App.2d 404, 411 [6] [301 P.2d 274]; *Ames* v. *Empire Star Mines Co., Ltd.,* 17 Cal.2d 213, 224 [14] [110 P.2d 13]; *Fulkerson* v. *Holmes,* 117 U.S. 389 [6 S.Ct. 780, 29 L.Ed. 915]; *Garbarino* v. *Noce,* 181 Cal. 125, 130 [2-3] [183 P. 532, 6 A.L.R. 1433].) This is recognized as the general rule in other states also.

"Ancient documents may be admitted in evidence as proof of the facts recited therein, provided the writers would have been competent to testify as to such facts. Such documents may, therefore, be received to prove or disprove title or possession, or the location of a boundary line, or the existence of a highway or right of way. They may also be admitted to prove matters of pedigree, heirship or widowhood; or to prove or disprove the identity of persons or land, or the existence of a power, or the authority of an executor or administrator to sell." (32 C.J.S. § 745.)

In some of the earlier cases the exclusionary rule of *ante*

*litem motam* has been referred to as applicable to documents which were, in fact, ancient documents. However, the vast majority of the authorities we have found apply no such rule to ancient documents as such.

### DOCUMENTARY V. ORAL DECLARATIONS

There appears to us to be an additional reason why, as relates to ancient documents, the rigidity of the *ante litem motam* exclusionary rule is alleviated somewhat in accordance with rule (b) as suggested by Professor Wigmore, *supra,* page 204, to the effect that where even though there might be temptation to falsify, other considerations such as easy detection or fear of possible punishment could be thought to counteract the temptation. Many courts have taken cognizance of the distinction between a written document duly authenticated or filed in a formal governmental proceeding and oral statements which are easily the subject of faulty memory or willful misconstruction. ▮ Thus in *Turney* v. *Sousa,* 146 Cal.App.2d 787, 791 [5] [304 P.2d 1025], the court says:

"Two general considerations form the key to the specific exceptions recognized to the hearsay rule and are both essential : Necessity for the evidence and circumstantial probability of trustworthiness as substitutes for cross-examination (citation). Evidently, there is an immense difference in trustworthiness between recitals in ancient documents drawn up by disinterested persons and oral statements of the interested person in possession made many years before and preserved during all those years only by the fallible memory of the witness, who even may have an interest to color his recollection. Nothing can in such case be considered a substitute for the impossibility of cross-examination of the original declarant. A rule making recitals in ancient deeds competent evidence is recognized in this state in *Garbarino* v. *Noce, supra* (181 Cal. 125, 130). No such exception to the hearsay rule for oral testimony concerning ancient possession is known to us and certainly it is in this state not one of 'those few express cases' of admissibility of hearsay referred to in Code of Civil Procedure, section 1845, *supra.*"

While we cannot agree with all of the reasoning used in *Welch* v. *All Persons,* 85 Mont. 114 [278 P. 110], we think the court there reached the correct conclusion and used, in part, the distinction above noted.

▮ In the case at bar the documents in question were

clearly ancient documents formally filed in a governmental proceeding to determine pension rights, retained in the possession of governmental officers and produced directly from the governmental file, all of them having an age in excess of 30 years and part of them being under oath. All of the circumstances surrounding their preparation and filing were available to the court and the jury, so that the court might reasonably measure the possibility of their trustworthiness to preliminarily exercise its discretion as to whether they were entitled to any weight at all for the purpose of admissibility, and also for the jury, having received them, to carefully weigh their value, if any. We think the court did not abuse its discretion in this regard.

## MARRIAGE VALIDITY

Appellants next contend that the evidence shows conclusively that Joseph's marriage to Anna was void because at the time of such marriage (August 16, 1880), Joseph was still the husband of Hester, the divorce between Joseph and Hester not having occurred until December 17, 1880. Their reasoning was based upon evidence produced by appellants that no record of a divorce of Hester and Joseph could be found in the States of Indiana or Ohio during the period in question, that is, from 1877 when Joseph and Hester were separated to August 16, 1880. They deduce therefrom that respondent is, in any event, an illegitimate son of Joseph and not entitled to inheritance. (Prob. Code, § 255; *Estate of Paterson,* 34 Cal.App.2d 305, 310 [93 P.2d 825].) They further contend that they have met the presumption of marital validity by such evidence and that the presumption is thus so completely dissipated that the jury may not consider or weigh the presumption in connection with the evidence. In support thereof they cite *Clendenning* v. *Parker,* 69 Cal.App. 685 [231 P. 765]; *Ponzi* v. *Ponzi,* 157 Cal.App.2d 772 [321 P.2d 847]; *Goff* v. *Goff,* 52 Cal.App.2d 23 [125 P.2d 848]; and *Estate of Smith,* 33 Cal.2d 279 [201 P.2d 539].

It should be noticed here, however, that all of the foregoing cases were ones in which the evidence contradicting the presumption of marital validity involved either the presence of conclusive proof to the contrary or a weighing of contrary evidence against the presumption. Respondent contends, first, that the evidence produced by appellants is not conclusive because the testimony relating to Joseph's residence in Ohio and Indiana did not foreclose the possibility that during the period in question he might have resided elsewhere and may

have secured a divorce in some other state; and, second, that the evidence that no record of other divorce between Hester and Joseph could be found in Ohio or Indiana was evidence of an adverse party and therefore could not completely obliterate the presumption, but only raise a conflict.

Code of Civil Procedure, section 1963, provides, *inter alia,* the following disputable presumptions which may be controverted by other evidence: "1. That a person is innocent of crime or wrong;", "25. Identity of person from identity of name;", "30. That a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage;". It has frequently been held that these presumptions are a species of evidence and that evidence to the contrary by the adverse party merely raises a conflict. This rule is too firmly established to admit of serious dispute. Since 1931, and the decision of *Smellie* v. *Southern Pacific Co.,* 212 Cal. 540, 549 [3], 551 [4] [299 P. 529], we find no deviation. (*Scott* v. *Burke,* 39 Cal.2d 388, 394 [3] [247 P.2d 313] ; *Goss* v. *Fanoe,* 114 Cal.App.2d 819, 825 [6-5b] [251 P.2d 337] ; *Estate of Miller,* 143 Cal.App.2d 544, 550 [7] [299 P.2d 1005] ; *Bliss* v. *Martin,* 74 Cal.App.2d 500, 516 [169 P.2d 61] ; *Estate of Kromrey,* 98 Cal.App.2d 639, 646 [2] [220 P.2d 805].)

The case of *Clendenning* v. *Parker, supra,* 69 Cal.App. 685, was one in which the undisputed evidence showed that Mrs. Parker married again only a few days after she admittedly left her lawful husband, Michael Haley, and it was impossible as a matter of law for her to have obtained a divorce in the interim. In the case at bar there was a lapse of three years. All witnesses having positive memories of the facts during the interlude from 1877 to 1880 are long since dead. While there was testimony that Joseph resided during that period in either Ohio or Indiana, we cannot view that testimony as conclusive in the sense of completely obliterating the presumption of validity entertained toward a ceremonial marriage and the parties thereafter continuing to deport themselves as husband and wife over a period of many years, raising children who were apparently accepted by both husband and wife as the children of the marriage. Thus we cannot say as a matter of law that the evidence was of such a character as to completely dispel the presumption. The burden of proof rule is purely a question of weight for the trial court and jury to decide. (*Ortega* v. *Ortega,* 118 Cal.App.2d 589, 593 [3] [258 P.2d 594].) Furthermore, the evidence relating to absence of

divorce in Indiana and Ohio was adverse-party evidence and as such merely raised a conflict.

 ''Generally speaking, it may be said that a presumption is dispelled as a matter of law only when a fact which is wholly irreconcilable with it is proved by the uncontradicted testimony of the party relying on it or of such party's own witnesses.'' (*Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509, 516 [8] [305 P.2d 36].) See also *Huntley* v. *County of Santa Clara,* 168 Cal.App.2d 298, 300 [3] [335 P.2d 722].

### AFFIDAVIT ADMISSIBILITY RESPECTING ANNA'S BELIEF IN VALID MARRIAGE

 Appellants contend that the statements of Anna's belief respecting the legitimacy of marriage as contained in the affidavits filed in the pension proceeding should not have been received in evidence, first, because they were double hearsay and, secondly, because the general rule respecting a statement of belief confines such statement to the time when the belief was immediately relevant. As hereinabove noted, an ancient document is admitted in evidence as proof of the facts recited therein provided the writer would have been competent to testify as to such facts. (See citations, *supra.*) Here Anna would have been competent to testify to declarations of Joseph as his statements were clearly within the pedigree exception. (Code Civ. Proc., § 1870, subd. 4.) Thus we do not have double hearsay in the ordinary sense. Both declarations come within the exception to the hearsay rule. The statements of Joseph in the connection here discussed were offered to show their effect on Anna's mental state as to her belief in her marriage, and were not, in this particular connection, offered for the truth of the matter asserted and thus were not subject to the bar of the hearsay rule.

Appellants also cite cases to the effect that where statements deal with past events and are not indicative of the mental state at the time of utterance, they are ordinarily excluded. However, as was stated in *Watenpaugh* v. *State Teachers' Retirement,* 51 Cal.2d 675, 679 [3] [336 P.2d 165], ''The declarations of a decedent may be admissible under certain circumstances to prove a state of mind at a given time although uttered before or after that time, on the theory that under these circumstances the 'stream of consciousness has enough continuity so that we may expect to find the same characteristics for some distance up or down the current.' ''

The belief of Anna in the validity of her marriage was a

continuing belief. Professor McCormick, in his work on evidence (McCormick on Evidence [1954]), at page 570 states: "However, the duration of states of mind or emotion varies with the particular attitudes or feelings in question and with the nature of the existing cause. Therefore the declaration must mirror a mental state which in the light of all the circumstances including proximity in time, has some probability of being the same condition which obtained at the material time. As in all instances where the inadmissible shades into the admissible according to relative degrees of probative force, the line between the admissible and the too remote being one that no two men would draw at exactly the same place, the admission of the evidence where there is room for doubt on this score should be left to the discretion of the trial judge."

In view of the peculiar problems attempted to be reached in the case at bar, we think the trial court exercised its discretion properly.

### ADULTERY CHARGE

In 1880, when Joseph and Anna were married, Indiana law provided: "When either of the parties to a marriage, void because a former marriage exists undissolved, shall have contracted such void marriage in the reasonable belief that such disability did not exist, the issue of such marriage begotten before the discovery of such disability by such innocent party shall be deemed legitimate." (Ind. Acts 1873, ch. 43, § 3, p. 107.)

Even though the record did not contain any direct evidence that Anna in 1880 and thereafter until the birth of Charles, entertained a reasonable belief that no former marriage of Joseph then existed, the presumption of Code of Civil Procedure, section 1963, "1. That a person is innocent of crime or wrong" (which is a law of the forum) would be sufficient of itself to supply the inference that she believed Joseph was an unmarried person. Thus from the presumption contained in the quoted Indiana statute, respondent advances the conclusion that if the jury had concluded that the marriage of Anna and Joseph on August 16, 1880, was void because of the existence of Joseph's prior marriage to Hester, nevertheless respondent would still be the legitimate son of the marriage by reason of the reasonable belief of Anna that Joseph at the time of his marriage to her was an unmarried man. In an attempt to rebut this conclusion, appellants offered Exhibits 47 and 48. Exhibit 47 showed that in the county

of Anna and Joseph's marriage an indictment was returned in 1879 charging Anna and Joseph with the crime of adultery. This exhibit shows that Anna was never served. There is no evidence that she was ever arrested. Exhibit 48 showed that the indictment was dismissed a short time later. The record does not indicate that the cause was ever tried nor that notice thereof was ever given to Anna. It appears, further, that the law of Indiana at that time provided that adultery could only be committed by the unlawful sexual intercourse of a married woman with some man not her husband. (*Hood* v. *State,* 56 Ind. 263, 271 [26 Am.Rep. 21].)

Appellants advanced the contention that since the Indiana community involved was comparatively small, the jury might infer that she would have acquired knowledge of the return of the indictment even though she had not been served. They further contend that they were entitled to have this evidence before the jury on that theory. However, the trial court, after having first admitted the evidence, struck it from the record on its own motion, ordering the jury to disregard it, and explained to them, in effect, that the evidence could not possibly of itself be any notice to the wife of any previous marriage or existing marriage on the part of the husband. We think the trial court's ruling was correct since under Indiana law the charge of adultery grew out of the marriage of the woman only. Such a charge could not have meant to Anna that her husband was previously married, but could only have meant that it was charged that she herself was married to another man. In order for the jury to indulge in this particular inference that Anna had notice of facts sufficient to put her on inquiry as to the marital status of Joseph, it would have had to base its inference not on facts proved but on the speculation that she knew of the charge, and on the additional conjecture that she held the mistaken notion, contrary to the law of Indiana, that the marital status of Joseph was an element of the crime of adultery in that state. The evidence would not justify such an inference, as an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture or guesswork. (*Eramdjian* v. *Interstate Bakery Corp.,* 153 Cal.App.2d 590, 602 [5-6] [315 P.2d 19].) We find nothing in any of the numerous cases cited by either litigant that even suggests any contrary rule.

Appellants contend that the marriage of Anna and Joseph was void because the marriage license was apparently issued

in a county in which Anna was not a resident. Insofar as this contention might affect the legitimacy of respondent herein, we think the same reasoning that we have given in the foregoing discussion applies. There was therefore left only a question of fact for the jury to determine on whether or not respondent was a legitimate heir.

## INSTRUCTIONS

 Appellants first contend that in one of their instructions the trial court modified the word ''must'' to use the word ''should'' in the place thereof, and by adding the following words: ''You should ascertain whether his parents were legally married, and if you find that they were not whether he was legitimated pursuant to some provision of law. The question of the legality or illegality of his parents' marriage, and the question whether if not originally legitimate he was afterwards legitimated, and the question whether if not legitimated he nevertheless is entitled to inherit property of the decedent, are to be decided by you under the law as set forth in these instructions and the evidence received during the trial.''

In examining the whole of this instruction as given by the court, the court, in effect, directed the jury to consider all of the evidence relating to the status of respondent as being legitimate or illegitimate offspring, whether or not his parents were legally married, and if not, whether or not he was legitimated under some provision of law. We can find nothing in the wording of the instruction which did not fairly present the law therein attempted to be conveyed to the jury.

 Appellants next complain of the insufficiency of the instructions on the requirements in Indiana relating to common-law marriage. These instructions conveyed a complete résumé of the subject. At the request of appellants, the court gave instructions quoting from and describing a whole gamut of the marriage relation, its contractual nature, legislative power to prescribe regulations, the conditions under which licenses might be issued and marriages solemnized, which marriages are void, the conditions under which a common-law marriage is recognized, the period of proof with respect thereto, how the same is consummated, the conditions under which it is void and becomes illicit and meretricious, that if Joseph Binkley had a wife living on August 16, 1880, the marriage was void, the presumption respecting the validity of a second marriage, and the burden of proof respecting the various contentions thereon. We think the court adequately covered

all of the contentions of the parties on this subject and that other instructions would have been merely repetitious. The law being thus adequately given, counsel had all that was necessary to expound their theories to the jury. In fact, the entire subject of common-law marriage as such seems to have been introduced into the instructions at the request of appellants, for we find in the record no instruction whatever on that subject from respondent.

Appellants contend that the court failed to give the following instruction: ''The presumption of identity of person from identity of name is rebutted if it be shown that there is more than one person to whom the name can be applied. Upon such showing there can be no presumption that either of such persons is the one to whom the jury should apply it.''

They claim that such instruction should have been given because the court gave the following instruction:

''The law presumes ...

''2. Identity of person from identity of name.

''. . . . . . . . . .

''These presumptions are a form of prima facie evidence and will support findings in accordance therewith in the absence of evidence to the contrary. When there is other evidence that conflicts with such presumptions it is the jury's duty to weigh that evidence against the presumption and any evidence that may support the presumption to determine which, if either, preponderates. ...''

The record shows that substantially all the evidence produced to the effect that there were other persons by the same name in the general vicinity of Joseph's residence was produced by appellants. This was adversary evidence. It created a conflict with presumption. The law as given by the court was correct. The offered instruction would have been erroneous because it took entirely from the jury the possibility of weighing the presumption and of determining the credibility of adversary evidence. (*Leonard* v. *Watsonville Community Hospital, supra.*) The presumption of identity of person from identity of name has long been recognized in California. (*Thompson* v. *Manrow*, 1 Cal. 428; *McKinley Bros.* v. *McCauley*, 215 Cal. 229, 234 [3] [9 P.2d 298]; *Estate of Horgan*, 93 Cal.App. 36, 40 [3] [268 P. 1090].)

*People* v. *Wong Sang Lung*, 3 Cal.App. 221 [84 P. 843], cited by appellants, merely recognizes the duty and obligation of the trial court in a criminal case to fully instruct the jury on all phases of the case which might be advantageous to the

defendant. This is clearly demonstrated by the discussion of the court in that case as contained on page 225. In civil cases there is no such rule.

The court did give extensive instructions on how to weigh a presumption, the overcoming of a presumption by contrary evidence, the use of all of the evidence, and the relative convincing force being left to the jury. We are satisfied that the instructions viewed as a whole fairly presented the theories of both respondent and appellants.

### The Half Blood's Right to Inherit

Appellants contend that even though respondent was the legitimate son of intestate's father, Joseph, he nevertheless was excluded from sharing the ancestral estate because he was a relative of the half blood and not of the blood of the ancestor. This contention relates to that evidence showing that the estate came to the intestate from her mother, Hester, and that since respondent was not of Hester's blood, he could not inherit from intestate, Cora. Appellants, however, are the children and grandchildren of Almira, who was a sister of Cora through Hester. Probate Code, section 254, provides as follows:

"Kindred of the half blood inherit equally with those of the whole blood in the same degree, unless the inheritance came to the intestate by descent, devise, or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestor must be excluded from such inheritance in favor of those who are."

Probate Code, section 253, provides as follows: "Collateral consanguinity is the relationship between people who spring from a common ancestor, but are not in a direct line. The degree is established by counting the generation from one relative up to the common ancestor and from the common ancestor to the other relative. In such computation the first relative is excluded, the other included, and the ancestor counted but once. Thus, brothers are related in the second degree, uncle and nephew in the third degree, cousins german in the fourth, and so on."

Probate Code, section 225, provides as follows: "If the decedent leaves neither issue nor spouse, the estate goes to his parents in equal shares, or if either is dead to the survivor, or if both are dead in equal shares to his brothers and sisters and to the descendants of deceased brothers and sisters by right of representation."

It is at once apparent that respondent is related to intestate in the second degree and that the nieces and nephews of intestate are related in the third degree, and the grandnieces and grandnephews are related in the fourth degree. Thus (Almira having predeceased the intestate), appellants take by reason of the relationship they bore to intestate at the time of her death and not by reason of an inheritance coming directly through Almira. This situation has been discussed in a number of cases in California contrary to the contention of appellants. In the *Estate of Warnock*, 36 Cal.App.2d 464, 469 [3] [97 P.2d 831], the court said:

"In the instant case, it must be conceded that the deceased's brothers and sisters of the half blood come within and are related in the second degree of consanguinity. The children of the deceased brother (nephews) are classified as being related in the third degree. (Sec. 253, Probate Code.) It therefore follows, in view of the above-mentioned decisions, and construction of section 254 of the Probate Code, that the respondents are not 'in the same degree' of consanguinity with those of the half sister and half brother. It therefore must follow that the exception provided in that section is not applicable. (Citation.)

"Appellants' contention, then, that the estate must be distributed under section 225 of the Probate Code in equal shares to decedent's brothers and sisters (which includes those of the half blood) and to the descendents of deceased brothers and sisters by right of representation must be sustained." To the same effect see *Estate of Smith*, 131 Cal. 433 [63 P. 729, 82 Am.St.Rep. 358]; *Estate of Belshaw*, 190 Cal. 278 [212 P. 13]; *Estate of Sayles*, 215 Cal. 207 [8 P.2d 1009]. We find nothing in *Estate of Ryan*, 21 Cal.2d 498 [133 P.2d 626], which contravenes the rule announced in the foregoing cases. The trial court's rule was correct.

From an examination of the entire transcript and briefs, we are of the view that the cause was fairly tried and each party's contentions were fairly before the jury for its consideration, and that its decision should stand.

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied June 21, 1960, and appellants' petition for a hearing by the Supreme Court was denied July 20, 1960.