Filed 11/7/25  P. v. Keeton CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM LEE KEETON,<br><br>    Defendant and Appellant. | D083540<br><br><br><br>(Super. Ct. No. SCD293485) |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

Alex Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

William Lee Keeton appeals his first degree murder conviction.  At trial, Keeton admitted he killed Roger Jauron but denied he had the requisite mental state for either theory of first degree murder the People pursued.

On appeal, Keeton argues instructional errors and his trial counsel's failure to object to certain statements the prosecutor made in closing prevented the jury from applying evidence of his defenses of voluntary intoxication and mental impairment to all specific intent elements of the murder by torture theory of first degree murder. He also contends these alleged errors cumulatively warrant reversal.

Even assuming error, however, we conclude on this record—which includes video footage of Keeton's repeated, focused attacks on Jauron over a prolonged period and Keeton's testimony he knew he was attacking Jauron's head and probably would not have done so had he been aware of the camera—the strength of the evidence Keeton committed willful, deliberate, and premeditated first degree murder against the voluntary intoxication and mental impairment evidence presented makes it not reasonably probable the jury would have otherwise reached a more favorable outcome. As a result, any error was harmless. We therefore affirm.

## I.

Jauron was found dead the morning of February 8, 2022. He was face down on the ground with severe injuries and "obvious signs of blunt force trauma," "mainly to the facial area."

## A.

Surveillance video captured the cause of Jauron's demise earlier that morning. Shortly after midnight, Jauron appeared to settle in for the night with blankets on the sidewalk outside a convenience store. Keeton attacked Jauron multiple times on three separate occasions, all while Jauron lay prone.

## 1.

At 1:28 a.m., Keeton walked past Jauron, who was mostly covered by blankets. Keeton looked down at Jauron while passing him, paused a few steps later, and turned back. He crouched down and lifted a blanket off Jauron's head. After doing so, Keeton paused for a few seconds to look at Jauron before lifting his right leg high above Jauron's head as if to stomp on it. But Keeton stopped and placed his foot on the ground without making contact.

Instead, Keeton crossed the street, retrieved a 24-pound metal trashcan lid, and returned to drop it onto Jauron's head. Jauron's body convulsed in response to the blow. Over the next twenty seconds, Keeton walked away before turning back to inspect the area near Jauron's head. Then Keeton again dropped the trashcan lid onto Jauron's head.

Keeton put the trashcan lid back in its place across the street and walked away, but he returned a minute later. He looked at Jauron's prone figure for a moment and then stood on him, appearing to put "almost his whole weight" onto Jauron's "head/neck area."

This first series of attacks ended by 1:32 a.m.

## 2.

The second round of attacks began 12 minutes later, when Keeton returned wearing a black facemask and a white towel on his head. He went straight to Jauron and stomped on his head or neck area twice. Keeton started to walk away, but he came back to stomp on Jauron's head area one more time while bracing himself against a nearby window. Each time, Jauron's body convulsed in response to the blow.

Next, Keeton ran across the street to get the same trashcan lid, which he brought down against Jauron's head or neck twice before putting it back

in its place.  Keeton then returned to Jauron to stomp on his head or neck repeatedly before ripping the towel off his head and walking away.

Not long after, Keeton came back.  He adjusted the blankets around Jauron and appeared to rifle through Jauron's jacket pockets while, at times, sitting on Jauron's upper body and punching his torso.

By 1:50 a.m., after about five minutes, this round of attacks ended when Keeton walked away.

### 3.

Forty minutes later, at 2:30 a.m., Keeton again returned to where Jauron lay, this time with a bicycle.  Surveillance video showed Jauron moving around—alive—not long before.  By this time, Jauron lay on the sidewalk outside his blankets.  Keeton covered Jauron entirely with the blankets, during which time he kicked and stomped on the area around Jauron's head a few times.

Eventually, Keeton rode his bicycle into Jauron.  He then lifted the front tire onto Jauron's head or neck area.  Keeton appeared to apply pressure to the front tire, so much so that at one point the back end of the bicycle lifted into the air.  He later stomped on Jauron repeatedly while bracing himself against the bicycle.  Next, Keeton dropped the bicycle and continued to stomp forcefully on the area by Jauron's head; Jauron's legs jolted in response.  After, Keeton pressed his foot against what might have been Jauron's neck for over twenty seconds.

Keeton stepped away briefly, then he came back and flipped Jauron's legs over his head.  Keeton again covered what appeared to be Jauron's head with a blanket and appeared to use his body to apply pressure to that area for some time.  Keeton next took one of Jauron's arms and twisted it in what was

described as "like an arm bar takedown" that forced Jauron onto his side. He then sat on Jauron's torso.

After forcefully stomping on Jauron's head and neck area at least five more times, Keeton finally ended his prolonged assault at 2:41 a.m.—roughly 11 minutes later—and rode away on the bicycle. Jauron was left lying motionless on the sidewalk.

## B.

Based on a review of the autopsy report, photographs, and surveillance video, a forensic pathologist testified Jauron died primarily from "blunt force head trauma" and also exhibited signs of neck pressure. The forensic pathologist opined that Jauron remained conscious—and thus alive—until the third and last series of attacks.

## C.

At trial, the People pursued two different theories of first degree murder: (1) willful, deliberate, and premeditated murder and (2) murder by torture. (Pen. Code, § 187, subd. (a); count 1.) The People also charged Keeton with a special circumstance alleging intentional murder involving torture. (§ 190.2(a)(18).)

With her client's knowledge and consent, defense counsel conceded Keeton committed second degree implied malice murder. But she argued against first degree murder and the special circumstance allegation based on Keeton's purported voluntary intoxication and mental impairment. Those defense theories rested primarily on testimony from Keeton and a clinical psychologist.

## 1.

Keeton testified in his own defense.

Keeton admitted to being a longtime daily methamphetamine user. According to Keeton, on February 7, 2022, he was "over-amped" from consuming 17 lines of methamphetamine and being awake for more than a week.

Keeton encountered Jauron the evening of February 7. He knew Jauron because they "both . . . liv[ed] on the street." Keeton claimed Jauron gave him a bag of vapes. Keeton later opened the bag to find the vapes purportedly covered with semen. Keeton somewhat denied searching for Jauron in response but conceded he "would say if I came across him, okay."

Keeton admitted to knowing it was Jauron when he came across him in the early hours of February 8. He testified Jauron told him to "go fuck" himself. After that point, Keeton claimed he "didn't know what's going on" and it was like he was "watching from [his] own shoulder." Keeton testified the events were "a blur," like "everything was speeded up." He described the interludes between his attacks as "like a flash" that he did not remember beyond he "would leave, [and then] it was like . . . I'm back there again."

Yet Keeton remembered the events leading to Jauron's death. He admitted knowing (1) he was attacking Jauron's head, both with the trashcan lid and when stomping his foot, and (2) Jauron was still alive when Keeton returned for the third round of attacks.

Keeton also admitted to lying to the police about what happened until he learned of the surveillance video. He explained that, had he been aware of the camera, he "probably wouldn't have done anything."

As to his mental health history, then-54-year-old Keeton told the jury about some hospitalizations and medications from his teenage years. As an adult, Keeton had been taken to the county mental health hospital between five and ten times for 14-hour holds.

6

2.

The defense's clinical psychologist testified about drug-induced psychosis. He described psychosis as a break in reality during which a person cannot "interpret the environment accurately" and might, but not always, hear voices or see things other people cannot hear or see. According to the psychologist, about 40 percent of methamphetamine users will experience drug-induced psychosis. The length of a person's methamphetamine use increases the vulnerability to becoming psychotic.

After meeting with Keeton nearly one year after Jauron's murder, the psychologist diagnosed Keeton with severe methamphetamine use disorder, major depressive disorder, and posttraumatic stress disorder. His testing indicated Keeton "wasn't exactly well put together" and "perhaps" could become psychotic "under certain conditions."

The psychologist did not review any surveillance video of Keeton attacking Jauron. Based on Keeton's history and self-reported methamphetamine use and lack of sleep at the time, he testified Keeton "probably had a drug-induced psychosis" when he killed Jauron. Because he did not meet with Keeton close in time to the murder, the psychologist could give only a "probable" diagnosis.

On cross-examination, the psychologist confirmed he had not diagnosed Keeton with drug-induced psychosis in this case. The psychologist was not aware of Keeton suffering any delusions the day of the murder. And he conceded his opinions about Keeton experiencing "probable heightened sense of paranoia and maybe some probable mania" that day stemmed solely from Keeton's own statements. Yet the psychologist could not say with certainty if Keeton was in "acute turmoil" or playing up his symptoms. And he agreed

7

someone "heavily under the influence of meth[amphetamine]" can still "make goal directed decisions."

## D.

The jury found Keeton guilty of first degree murder. To reach that verdict, jurors did not have to agree on the same theory of first degree murder so long as they agreed on the degree. The jury found the special circumstance allegation of murder involving the infliction of torture not true.

The court sentenced Keeton to a prison term of 25 years to life.

## II.

## A.

Keeton's first two claims of error involve jury instructions. We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

## 1.

The People seek to apply the forfeiture or invited error doctrines to these claimed instructional errors. We decline to do so.

The People argue Keeton forfeited these claims by not objecting at trial. We elect to reach the merits, despite trial counsel's failure to object, given Keeton's alternative claim of ineffective assistance of counsel. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

The People also contend Keeton invited any error on these instructions. For the invited error doctrine to apply, "the record must show only that counsel made a conscious, deliberate tactical choice." (*People v. Cooper* (1991) 53 Cal.3d 771, 831.) The People's single paragraph on invited error, however, lacks any citation to the record. As a result, this argument is underdeveloped and unpersuasive. (See *In re Champion* (2014) 58 Cal.4th 965, 986.)

We thus proceed to the merits.

Keeton argues the trial court erred by failing to instruct the jury that it could consider evidence of his voluntary intoxication or mental impairment for two elements of first degree murder by torture. The People counter the instructions were correct and any error was harmless. Even assuming error, we discern no prejudice.

a.

The court instructed the jury on the different requirements for each theory of first degree murder and the special circumstance allegation. (CALCRIM No. 521.) We focus on those related to Keeton's mental state while killing Jauron.

For the first theory, the People had to prove Keeton acted willfully—meaning he intended to kill—as well as deliberately and with premeditation.

The second theory required the People to prove Keeton (1) "willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain" on the still-living victim and (2) "intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason." Murder by torture did not require the jury to find Keeton intended to kill Jauron.

The special circumstance alleging murder involving torture required the People to prove Keeton intended to (1) kill Jauron, (2) inflict extreme physical pain and suffering on Jauron while he was alive, and (3) inflict such pain and suffering for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason.

Evidence of voluntary intoxication or mental impairment caused by mental disease, defect, or disorder is admissible "solely on the issue of

whether or not the accused actually formed a required specific intent." (§§ 28, 29.4(b).)

As relevant here, the court instructed the jury it could consider evidence of Keeton's voluntary intoxication or mental impairment only in deciding if Keeton (1) acted with an intent to kill, (2) acted with deliberation and premeditation, or (3) intended to inflict extreme and prolonged pain. (CALCRIM Nos. 625, 3428.)  The jury could not consider such evidence "for any other purpose."

b.

Keeton contends these instructions wrongly precluded the jury from considering voluntary intoxication and mental impairment evidence to decide if he intended to inflict extreme and prolonged pain (1) "willfully, deliberately, and with premeditation" and (2) "for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason" for the first degree murder by torture theory.  Even assuming error, however, we conclude the omission was harmless.

The parties disagree on the standard for assessing prejudice.  The People seek review under *People v. Watson* (1956) 46 Cal.2d 818, 836. Though Keeton acknowledges courts "previously" applied *Watson* to review prejudice stemming from incorrect pinpoint instructions on voluntary intoxication and mental disorder evidence, he argues *People v. Schuller* (2023) 15 Cal.5th 237 "dictates" applying the stricter standard of *Chapman v. California* (1967) 386 U.S. 18, 24.  *Schuller* applied *Chapman* review to the failure to instruct on imperfect self-defense because that defensive theory "operates to negate an element of the charged offense," and thus "requires the prosecution to prove the absence of that circumstance beyond a reasonable doubt." (*Schuller*, at p. 260.)  But our Supreme Court

10

"emphasize[d] that [its] conclusion [wa]s predicated on the 'unique' relationship between murder and voluntary manslaughter" and specifically "express[ed] no opinion on the appropriate standard of review for instructional errors related to other forms of defensive theories." (*Ibid.*) Unlike *Schuller*, the instructions here did not relieve the prosecution of its burden to prove the specific intent elements of first degree murder under either theory. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325, fn. 9 [failure to give "fully inclusive" pinpoint instruction of voluntary intoxication "did not . . . unconstitutionally lessen the prosecution's burden of proof"].) As a result, we apply *Watson* review. (*Id.* at p. 325.) In doing so, we may consider "'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

We discern no prejudice here. Because Keeton admitted to second degree murder, all that remained for the jury to decide was whether the killing rose to the level of first degree murder. Notably, this claim of error affected only the murder by torture theory of first degree murder, not the willful, deliberate, and premediated theory.

Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) Deliberation refers to the careful weighing of considerations in forming a course of action. (*Ibid.*) Thus, "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) Above all, "[t]he true test is not the duration of time as much as it is the extent of the reflection." (*People v. Thomas* (1945) 25 Cal.2d

11

880, 900.) "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*Ibid.*)

We agree with the People the record contains "overwhelming evidence that the murder was willful, premeditated, and deliberate" despite any evidence of voluntary intoxication or mental impairment. Keeton encountered Jauron some hours after believing Jauron gave him a bag of vapes covered in semen, which could supply a motive for revenge supporting this theory of first degree murder. (See *People v. Watkins* (2012) 55 Cal.4th 999, 1026.) Keeton seemed to admit that he might have done something if he "came across" Jauron, even if he were not actively looking for him. Once he saw Jauron lying on the sidewalk, Keeton lifted the blanket off his head, ostensibly to confirm his identity before attacking, and Keeton testified he knew it was Jauron.

As described above, Keeton knowingly and repeatedly attacked Jauron's head, a body part far more likely to result in death than an extremity. And during the series of attacks spanning more than one hour, Keeton left for longer periods twice, first for 12 minutes and then for 40 minutes, before returning to continue the beatings. In addition to his fists and feet, Keeton acquired and wielded different weapons. He took the time to retrieve the 24-pound trashcan lid from across the street and return it to its proper place on two separate occasions. During the final round of attacks, Keeton brought a bicycle to ride into Jauron and press against his head or neck area. Such evidence indicates an intentional killing with deliberation and premeditation.

The evidence presented on voluntary intoxication and mental impairment was comparatively weak. Though Keeton testified he was "over-amped" on methamphetamine and some of the events were blurred or

12

"speeded up," his testimony he likely would not have murdered Jauron had he realized a surveillance camera would capture it reflected an awareness of his actions at the time that undermined his voluntary intoxication defense. As for mental impairment, the defense psychologist—who never watched the surveillance video—gave only a "probable" diagnosis of drug-induced psychosis while expressing uncertainty whether Keeton was truthful in reporting his symptoms. And the psychologist acknowledged a person "heavily" under the influence of methamphetamine could still make goal-directed decisions.

Keeton insists the jury's not true finding on the special circumstance of murder involving torture is "critically important" to assessing prejudice. Because the special circumstance allegation required both intent to kill *and* intent to inflict extreme physical pain and suffering for certain calculated purposes, Keeton asserts the not true finding "necessarily means that *every* juror harbored a reasonable doubt with respect to at least one" of those elements. Possibly, but not necessarily. It is equally possible the jury "may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding through mistake, compromise, or lenity." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 [cleaned up].)

Regardless, the finding on the special circumstance allegation does not, as Keeton contends without supporting authority, "strongly suggest[ ]" the jury considered the question of first versus second degree murder "close." Though the finding could indicate the jury was not convinced of both of the prosecution's theories of first degree murder, it casts no concrete doubt on either theory individually. As Keeton notes, the jury could have reached its verdict by finding he lacked the intent to inflict extreme physical pain for the

13

requisite calculated purpose but committed a willful, deliberate, and premeditated murder.

In sum, on this record it is not reasonably probable Keeton would have obtained a more favorable outcome absent these alleged instructional errors.

3.

Keeton also challenges the mental impairment instruction for not including "malice aforethought" in the list of mental states for which the jury could consider this evidence. Once again, even assuming error, we discern no prejudice on this record.

We apply the same prejudice standard as above, as an instructional error that results in the exclusion of defense evidence is subject to *Watson* review. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.)

a.

Evidence of mental impairment from mental disease, defect, or disorder is admissible as to whether the defendant harbored malice aforethought. (§ 28(a).)

The court instructed the jury on the two kinds of malice aforethought: express malice and implied malice. It explained Keeton had express malice if he "unlawfully intended to kill." The jury was told he had implied malice if (1) he intentionally committed the act; (2) the natural and probable consequences of which were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life.

The mental impairment instruction explained the jury could consider such evidence in deciding if Keeton acted "with the required intent or mental state," but omitted malice aforethought from the specific list that followed. It did however, list "intent to kill."

14

b.

For prejudice, Keeton recognizes the prosecutor accurately informed the jury it could consider mental impairment evidence for express malice and focuses his arguments on implied malice.

As to implied malice, Keeton perceives prejudice despite conceding at trial that he acted with implied malice for second degree murder. His arguments, however, are unavailing.

First, because (1) first degree murder by torture does not require express malice intent to kill and (2) the prosecutor told the jury in closing it could not consider any mental impairment evidence for implied malice, Keeton contends the jury could have "mistakenly conclude[d] that mental impairment could not be considered on the first-degree murder by torture theory." But the instruction on the two theories of first degree murder does not list implied malice as an element of murder by torture, and it mentions implied malice only once when noting the "requirements for second degree murder based on express or implied malice" can be found elsewhere. On the other hand, the "inflict extreme and prolonged pain" language in the mental impairment instruction comes directly from the definition of murder by torture in the first degree murder instruction. That the special circumstance required proof of this mental state and intent to kill makes no difference. As we presume jurors can "understand and correlate instructions" (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095), we discern no reasonable probability of the jury drawing the conclusion Keeton posits.

Second, Keeton claims "the prosecutor also erroneously suggested that a finding of implied malice could support a willful, deliberate, and premeditated murder conviction." But she did not. The prosecutor told jurors they had to agree Keeton committed second degree murder "whether

15

you agree implied malice or express malice." "Then," she continued, "you consider the defendant's intent more closely to elevate it up to the first-degree murder." Keeton had to reverse and splice these separate sentences together to argue "[t]hese remarks suggest that murder can be 'elevated up to first' regardless of 'whether you agree implied malice or express malice.'" Such contortion fails to persuade.

Besides, given Keeton's admission to implied malice second degree murder and our discussion of the record above, none of Keeton's prejudice arguments convince us a more favorable outcome would have been reasonably probable had the mental impairment instruction listed malice aforethought or implied malice.

## B.

Next, Keeton argues his trial counsel rendered ineffective assistance "by failing to object to the prosecutor's misstatements of the law." But because the alleged misstatements, as Keeton himself notes, "are identical to the legal errors in the mis-instructions on voluntary intoxication and mental disorder" and trial counsel's failure to object "is prejudicial for essentially the same reasons," this claim fails for lack of prejudice for the reasons discussed above.

## C.

Lastly, Keeton challenges the cumulative impact of these asserted errors, contending together they "exacerbated the prejudicial effect of one another by improperly limiting the jury's use of Keeton's intoxication and mental impairment evidence." We are not convinced. Instead, we conclude each of the assumed errors we discussed "was harmless in itself, and on this record the whole of them did not outweigh the sum of their parts." (*People v.*

16

*Roberts* (1992) 2 Cal.4th 271, 326.)  Their cumulative effect is thus too slight to warrant reversal.  (*Ibid.*)

### III.

We affirm the judgment.

CASTILLO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.